## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Civil Action Number: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| USASF Servicing, LLC, | |
| Defendant. | |

1.     The Consumer Financial Protection Bureau (Bureau) brings this action against USASF Servicing, LLC (USASF) for committing unfair acts and practices in violation of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1).

2.     USASF is the servicer of car loans originated by its affiliate U.S. Auto Sales, Inc., a buy-here, pay-here car dealer with dealerships throughout the Southeast United States.

3.     Since 2016, USASF acted unfairly by: wrongfully activating starter-interruption devices to disable consumers' vehicles and activate warning alerts; failing to provide millions of dollars in refunds of add-on premiums that

1

consumers were entitled to; charging consumers twice for collateral-protection insurance each billing cycle, sometimes for over a year; misapplying consumer payments such that consumers accrued over $1,000,000 in additional interest and fees; and wrongfully repossessing dozens of consumers' vehicles.

4.      The Bureau brings this action to obtain injunctive relief, redress for consumers, and a civil money penalty.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

6.      This Court has personal jurisdiction over Defendant and venue is proper because Defendant is located, resides, and conducts business in this district. 12 U.S.C. § 5564(f).

## PARTIES

7.      The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is charged with enforcing Federal consumer financial laws, including the CFPA. 12 U.S.C. §§ 5531(a), 5564(a)-(b), 5481(14).

8.     USASF is an automobile-loan servicer with its principal place of business at 540 U.S. Auto Sales Blvd., Lawrenceville, Georgia 30046. USASF transacts business in this district.

9.     USASF services automobile loans that are used by consumers for personal, family, or household purposes. USASF is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5), (6), 15(A)(i).

## FACTUAL ALLEGATIONS

### USASF Wrongfully Activated Starter-Interruption Devices

10.     A starter-interruption device (SID) is a device that an auto-loan servicer can activate to sound warning tones or disable the car altogether.

11.     Since at least March 2016, SIDs were installed in the vehicles whose loans USASF serviced, with the exception of vehicles sold in November 2016.

12.     When USASF activated the warning tones, every time the consumer turned their vehicle on or off, a ten-second series of beeps would occur.

13.     According to USASF, a consumer is delinquent and in default the moment the consumer misses one payment. According to USASF's internal procedures, USASF would activate warning tones for the first four days following a missed payment and would disable the vehicle once the consumer was five days

past due, but would not activate the SID if the consumer had made a promise to pay their loan.

14.     Since 2016, USASF activated SIDs in consumers' vehicles tens of thousands of times in violation of its own policy, including at least 7,500 erroneous disables and over 71,000 erroneous warnings.

15.     USASF admitted to the Bureau that, due to programming errors, system miscommunication, and human error, USASF erroneously disabled vehicles at least 7,500 times.

16.     Of the erroneous disables, at least 5,200 occurred when the consumer was not in default or had made a promise to pay. USASF wrongfully disabled vehicles at least another 1,500 times after it had explicitly promised the consumers that it would not.

17.     USASF also admitted to the Bureau that, due to programming errors, system errors, and human error, USASF erroneously sent warning tones over 71,000 times to consumers who had made a payment or were not in default.

18.     The erroneous warning tones persisted for four days for many consumers, and they lasted more than four days in hundreds of instances.

19.     USASF's wrongful activation of SIDs caused consumers substantial injury. Consumers whose SID activation disabled their vehicles were harmed by

being deprived of the use of their vehicles. Those who received warning tones in error were distressed, confused, and spent time contacting USASF or USASF's SID vendor to attempt to resolve the issue.

20.     Consumers were not able to avoid these injuries. Consumers had no control over USASF wrongfully activating SIDs when they were not in default. And consumers who had made arrangements with USASF to disable a SID activation could not stop USASF from failing to update their accounts and relay appropriate system notifications.

21.     USASF's wrongful activation of SIDs did not benefit consumers or competition.

### USASF Failed to Ensure Refunds of Unearned GAP Premiums at Charge-Off and Early Payoff

22.     Guaranteed Asset Protection (GAP) is an add-on product that covers some of the deficiency balance if a car is totaled and the consumer still owes money on their car loan after the application of auto-insurance proceeds.

23.     U.S. Auto Sales, Inc., an affiliate of USASF, sold GAP to consumers from February 2017 until October 2022. From February 2017 through August 2021, around 64,000 consumers purchased GAP from U.S. Auto Sales, Inc.

24.     When GAP was sold to consumers, its cost was added to the loan used to purchase the car, and the loan was then serviced by USASF. Although U.S.

Auto Sales, Inc. sold the GAP and USASF serviced the loan that paid for it, the GAP product was administered by unaffiliated companies.

25.   USASF repossessed cars from consumers before the end of their loan term in certain circumstances, for example if the consumer stopped making payments on their loan. USASF would then "charge off" the accounts of some of these consumers, meaning USASF wrote off the account as a loss. Consumers whose loans were charged off were still legally obligated to pay any outstanding loan amount.

26.   GAP coverage becomes void and worthless to the consumer when USASF repossesses a car and charges off the loan because the consumer no longer has the car. Because the consumer paid for GAP based on the entire loan term and the car was repossessed prior to the end of the term, some of the GAP premiums that the consumer paid and the interest charged on such premiums were not earned and are therefore eligible to be refunded by the GAP administrator.

27.   When USASF repossessed a car and charged off an account, its policy was to obtain a refund of any unearned GAP premiums that consumers had paid by submitting a refund request to the GAP administrator. USASF would then apply any refund to the deficiency balance on the loan, reducing the amount that the consumer still owed on the car loan.

28.     USASF failed to follow this policy for at least 2,870 consumers, resulting in over $1 million in refunds that were not obtained and applied to those consumers' deficiency balances.

29.     GAP coverage also becomes void and worthless when a consumer's loan is paid off before the end of the loan contract because, once the loan is paid off, there is no possibility of a deficiency for GAP to cover.

30.     When a consumer's loan was paid off early, USASF requested a payoff amount that included GAP premiums for the full term of the loan contract. As a result, a portion of the GAP premiums that USASF collected at early payoff was unearned because consumers paid for coverage that could never be provided.

31.     When a third party paid off a consumer's loan early, such as a lender paying off the loan because the consumer was refinancing, then USASF as a matter of course submitted a refund claim to the GAP administrator. When doing so, USASF used the date of the loan payoff as the date the GAP was cancelled.

32.     In contrast, when a consumer paid off their loan early, USASF would not submit a refund request to the administrator unless the consumer specifically requested a refund of unearned premiums from USASF. USASF imposed this requirement even though the request provided USASF with no new information and was not necessary for USASF to obtain a consumer refund from the

administrator. And rather than use the payoff date as the date the GAP was cancelled, USASF used the date of the refund request, which resulted in lower payouts for consumers who requested refunds.

33.    USASF failed to provide refunds of unearned GAP premiums and unearned interest totaling at least $4 million for an estimated 5,600 consumers who paid off their car loans early. Even when USASF requested consumer refunds at early payoff, it provided consumers with inaccurately small refunds because it failed to request the refund as of the payoff date and failed to refund interest charged on unearned premiums, totaling at least an additional $2 million.

34.    USASF's failure to ensure refunds of unearned GAP premiums caused consumers substantial injury. Consumers whose loans were charged off were harmed by owing inflated deficiency balances totaling over $1 million. Consumers whose loans were paid off early were harmed by being deprived of their refunds totaling more than $6 million.

35.    Consumers' ability to avoid these harms was limited. Consumers had no control over USASF's failure to follow its own policy of requesting refunds of unearned premiums when loans were charged off. And many consumers who paid off their loans early likely did not know that USASF demanded a final payoff amount that included premiums for coverage they could never receive, or that they

would need to make a refund request even though USASF already had all the

information it needed to obtain the refund (and in fact did obtain the refund in

certain situations). Finally, even consumers who did request refunds could not

avoid the harm from USASF using their refund-request date as the date that GAP

was cancelled, even though the GAP had already become void and worthless at

early payoff, and keeping their unearned interest.

36.    USASF's failure to ensure full refunds of unearned GAP premiums

did not benefit consumers or competition.

### USASF Double Billed Consumers for Collateral-Protection Insurance

37.    Collateral-protection insurance (CPI) is physical-damage insurance

that protects the lender if the consumer does not have auto insurance that covers

the amount of the loan.

38.    U.S. Auto Finance, Inc., an affiliate of USASF, placed consumers

under its CPI in two ways. First, consumers could voluntarily agree to CPI at the

point of sale for the vehicle. Second, consumers could be automatically placed

under U.S. Auto Finance, Inc.'s CPI if the consumer's comprehensive-and-

collision insurance expired or was cancelled. In either circumstance, USASF, as

the loan servicer, charged the consumer for the CPI and collected payments for it.

39.     The cost of CPI to consumers was around $100 per month, depending on their billing plan and area.

40.     From December 2015 through August 2021, USASF billed consumers at least 34,000 times in error for CPI by charging them twice, totaling an estimated $1.9 million. USASF identified four causes of its double billing, including manual and system-processing errors by USASF.

41.     From 2015 to 2019, during the time when USASF used a servicing system called AutoStar, it often took more than 60 days for USASF to correct the double-billing error. Later, from 2019 to 2021, after USASF switched providers to Spectrum, it took USASF even longer to correct its double billing, averaging over 120 days.

42.     In over 5,800 instances, when USASF was using Spectrum, USASF failed to correct the double-billing error for more than one year.

43.     While USASF was double-billing consumers, it was erroneously charging them twice per billing cycle.

44.     Further, during the time when USASF used Spectrum, the erroneously billed CPI fee was included in the amount USASF reported to credit-reporting agencies.

45.     USASF's billing errors caused consumers substantial injury. Consumers who were charged twice for CPI were deprived of the use of their funds totaling $1.9 million, and in addition some consumers became delinquent because of the billing error and as a result had their cars repossessed and were subjected to erroneous debt-collection efforts.

46.     Consumers could not avoid these harms. Consumers had no control over how USASF billed for CPI and had no reason to expect to be double billed.

47.     USASF's double billing of CPI did not benefit consumers or competition.

## USASF Misapplied Consumer Payments

48.     Under the contracts that USASF serviced, USASF was required to apply any payments above the regularly scheduled amount first to accrued interest. Thousands of times, however, USASF wrongfully applied extra payments first to late fees or CPI fees instead of accrued interest.

49.     USASF admitted to the Bureau that it misapplied extra payments at least 8,738 times over nearly five years, from November 1, 2016 to August 31, 2021.

50.     USASF's misapplication of payments caused consumers substantial injury. Consumers whose payments were misapplied were harmed because they

paid approximately $1.2 million in interest and fees that they would not have paid if USASF had correctly applied their payments.

51.    Consumers could not avoid these harms. Consumers had no control over how USASF applied payments and had no reason to expect a misapplication.

52.    USASF's misapplication of payments did not benefit consumers or competition.

### USASF Wrongfully Repossessed Consumer Vehicles

53.    USASF's policy is to repossess a vehicle either if a consumer misses a deferred down payment, which is an additional amount that a consumer is scheduled to pay within the first thirty days after taking possession of the vehicle and before the first installment payment, or once a consumer is sixty days past due.

54.    USASF does not send a notice to the consumer informing them that it plans to repossess the vehicle unless state law requires a right-to-cure notice, which is a notice giving consumers a certain amount of time to bring their account current before their car is repossessed.

55.    Since July 2019, USASF has used a repossession forwarder, Primeritus, which is a company that directs local recovery agents to repossess vehicles on behalf of USASF. From November 2016 to July 2019, USASF worked with a different repossession forwarder, Consolidated Asset Recovery System

(CARS), before CARS was acquired by Primeritus. USASF communicated with both repossession forwarders to connect with third-party repossession agents through a software platform called IBEAM.

56.     USASF's communication with repossession agents is limited to notices through IBEAM, including "holds" on repossession. A hold on a repossession is a direction from USASF to not repossess a vehicle after it initially ordered a repossession.

57.     Consumers qualified for holds for various reasons. Under USASF policy, a hold should have been triggered when a consumer made a payment or a promise to pay, or when a consumer entered bankruptcy.

58.     Consumer accounts could also qualify for a repossession hold if USASF agreed to defer a payment, which could be on account of a natural disaster or the loss of employment, among other reasons.

59.     In addition, the Servicemembers Civil Relief Act (SCRA) prohibits repossession of vehicles of active-duty servicemembers without a court order. USASF (or its agent) performed so-called "SCRA scrubs" to check whether a consumer was on active military duty. If so, that should also have triggered a hold on repossession.

60.    Prior to December 2020, USASF did not have a formal process to flag activities on an account that would trigger a repossession hold. As a result, servicing supervisors were not notified when, for example, a consumer made a payment or a promise to pay, or when USASF received notice that the consumer was in bankruptcy. Consequently, prior to December 2020, there was no servicing supervisor oversight as to whether a repossession hold should be in place on an account that had been sent to a forwarder.

61.    Prior to December 2021, USASF did not have a process to automatically send a repossession-hold request to its repossession forwarder when a consumer made a payment or a promise to pay, or when USASF received notice that the consumer was in bankruptcy.

62.    USASF's failure to implement these processes caused dozens of erroneous repossessions of consumers' vehicles.

63.    At least forty-seven consumers made a payment that should have stopped the repossession, but because USASF failed to close the repossession assignment, consumers' vehicles were nonetheless repossessed.

64.    Even when a USASF employee correctly closed the repossession assignment, USASF failed to effectively manage its recovery agents and failed to implement sufficient controls to ensure that repossession assignments were

properly closed, resulting in wrongful repossessions for at least seven additional consumers.

65.    Several more consumers made a promise to pay, and a USASF employee either failed to close the repossession assignment or failed to enter the promise to pay into USASF's system, causing consumers to lose their cars.

66.    USASF agreed to a deferred payment with at least two consumers, which, when not processed by USASF employees, resulted in repossession.

67.    In at least one instance, USASF repossessed a vehicle before the state-required "right to cure" letter had expired.

68.    At least five consumers did not qualify for repossession in the first instance, yet USASF assigned their accounts for repossession in error.

69.    At least another five consumers informed USASF of their bankruptcy filing, but USASF's failure to close the repossession assignment caused consumers to nonetheless have their vehicles repossessed, in violation of consumer bankruptcy protections.

70.    In total, USASF admitted to the Bureau that it wrongfully repossessed vehicles 78 times.

71.     In addition to those 78 repossessions that USASF admitted were wrongful, it wrongfully repossessed at least four vehicles where the consumer was active-duty military.

72.     USASF's wrongful repossessions of consumers' vehicles caused consumers substantial injury. Some consumers' vehicles were sold by USASF. When USASF returned the wrongfully repossessed vehicles to consumers, as opposed to selling them, consumers were harmed by not being able to use their vehicles for up to 17 days.

73.     Consumers could not avoid these harms. Consumers had no control over USASF's errors, its failure to effectively manage its repossession agents, or its failure to adopt sufficient controls to ensure that repossession holds were implemented.

74.     USASF's erroneous repossession of vehicles did not benefit consumers or competition.

## COUNT I
**Violation of the Consumer Financial Protection Act (Unfairness)**
**USASF Wrongfully Activated Starter-Interruption Devices**

75.     The allegations in Paragraphs 1 through 74 are incorporated by reference.

76.     The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

77.     USASF's wrongful activation of SIDs caused substantial injury to consumers. Consumers whose vehicles were disabled were deprived the use of their vehicles. Consumers who received warning tones in error experienced distress and confusion and were forced to spend time contacting USASF or USASF's SID vendor to resolve the issue.

78.     Consumers were not reasonably able to avoid this harm because they had no control over USASF's wrongful activation of SIDs when consumers were not in default or had reached agreement with USASF to disable a SID activation.

79.     USASF's wrongful activation of SIDs did not benefit consumers or competition.

80.     Accordingly, USASF's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT II
**Violation of the Consumer Financial Protection Act (Unfairness)
USASF Failed to Ensure Refunds of Unearned Premiums**

81.     The allegations in Paragraphs 1 through 74 are incorporated by reference.

82.     The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

83.     USASF's failure to ensure refunds of unearned GAP premiums at charge-off or early payoff caused substantial injury to consumers. Consumers whose loans were charged off were collectively denied at least $1 million in refunds to which they were entitled, and consumers who paid off their loans early were collectively denied at least $6 million in refunds to which they were entitled.

84.     Consumers were not reasonably able to avoid this harm because they had no control over USASF's failure to follow its own policy of requesting refunds of unearned premiums when loans were charged off, many consumers who paid off their loans early likely did not know that USASF demanded a final payoff amount

18

that included premiums for coverage they could never receive, or that they had to request a refund of those amounts even though USASF already had all the information it needed to provide the refund. And even consumers who requested refunds could not avoid the harm from USASF using an incorrect date for the GAP-cancellation date and failing to refund interest paid on unearned premiums.

85.    USASF's failure to ensure refunds of unearned GAP premiums did not benefit consumers or competition.

86.    Accordingly, USASF's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT III
### Violation of the Consumer Financial Protection Act (Unfairness)
### USASF Double Billed Consumers for Collateral-Protection Insurance

87.    The allegations in Paragraphs 1 through 74 are incorporated by reference.

88.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

89.    USASF's double billing of CPI caused substantial injury to consumers. At least 34,000 consumers were charged twice for CPI. These consumers were unable to use their funds, totaling $1.9 million, and the double billing caused delinquencies, repossessions, and erroneous debt-collection efforts.

90.    Consumers were not reasonably able to avoid this harm because they had no control over how USASF billed for CPI and no reason to expect to be double billed.

91.    USASF's double billing of CPI did not benefit consumers or competition.

92.    Accordingly, USASF's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT IV
### Violation of the Consumer Financial Protection Act (Unfairness)
### USASF Misapplied Consumer Payments

93.    The allegations in Paragraphs 1 through 74 are incorporated by reference.

94.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not

outweighed by countervailing benefits to consumers or to competition. 12 U.S.C.

§ 5531(c).

95.     USASF's misapplication of payments caused substantial injury to

consumers. USASF misapplied payments at least 8,738 times. Consumers subject

to these errors paid approximately $1.2 million in additional interest and fees.

96.     Consumers were not reasonably able to avoid this harm because they

had no control over how USASF applied payments and no reason to expect their

payments to be misapplied.

97.     USASF's misapplication of payments did not benefit consumers or

competition.

98.     Accordingly, USASF's actions constituted unfair acts and practices, in

violation of the CFPA.

## <u>COUNT V</u>
### Violation of the Consumer Financial Protection Act (Unfairness)
### USASF Wrongfully Repossessed Consumer Vehicles

99.     The allegations in Paragraphs 1 through 74 are incorporated by

reference.

100.     The CFPA makes it unlawful for any covered person to engage in any

unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if: (1)

it causes or is likely to cause substantial injury to consumers which is not

reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

101.    USASF's erroneous repossession of consumer vehicles caused substantial injury to consumers. The 82 identified consumers whose vehicles were repossessed in error were harmed by having their vehicles sold or not being able to use their vehicles for up to 17 days.

102.    Consumers were not reasonably able to avoid this harm because they had no control over the errors made by USASF or its repossession agent.

103.    USASF's erroneous repossession of vehicles did not benefit consumers or competition.

104.    Accordingly, USASF's actions constituted unfair acts and practices, in violation of the CFPA.

## **DEMAND FOR RELIEF**

Wherefore, the Bureau requests that this Court:

    a.    permanently enjoin USASF from committing future violations of the CFPA;

    b.    award such relief as the Court finds necessary to redress injury to consumers resulting from USASF's violations of the CFPA,

including but not limited to rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation from unjust enrichment, and payment of damages;

c.   impose a civil money penalty against USASF for its CFPA violations;

d.   award the Bureau its costs of bringing this action; and

e.   award such other and further relief as this Court deems just and proper.

Dated:        August 2, 2023                    Respectfully Submitted,

                                                Consumer Financial Protection Bureau

                                                ERIC HALPERIN
                                                Enforcement Director

                                                RICHA S. DASGUPTA
                                                Deputy Enforcement Director

                                                MICHAEL POSNER
                                                Assistant Deputy Enforcement Director

                                                **Elena González**
                                                New York Bar No. 430526
                                                Attorney for Plaintiff
                                                Consumer Financial Protection Bureau

23

1700 G Street, NW
Washington, DC 20552
Telephone: 202-435-9103
Email: elena.gonzalez@cfpb.gov

**<u>Joseph Sanders</u>**
New York Bar No. 4397204
Illinois Bar No. 6308241
Attorney for Plaintiff
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: 202-435-9642
Email: joseph.sanders@cfpb.gov