# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-03433-VMC |
| USASF Servicing, LLC, | |
| Defendant. | |

## <u>PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT</u>

# TABLE OF CONTENTS

I.   BACKGROUND...................................................................................1

   A. Procedural History.......................................................................1

   B. Factual Background......................................................................2

      1. USASF Wrongfully Activated Starter-Interrupter Devices. .....................2

      2. USASF Failed to Refund Unearned Fees.....................................3

      3. USASF Double Billed Consumers for Insurance.........................5

      4. USASF Misapplied Consumer Payments. ....................................6

      5. USASF Wrongfully Repossessed Vehicles...................................6

II.  ARGUMENT ....................................................................................8

   A. Legal Standard for Default Judgments ...........................................8

   B. Default Judgment on Liability is Warranted. ..................................9

      1. USASF is subject to the CFPA's unfairness prohibition. ..........9

      2. USASF committed unfair acts and practices...............................9

         a. USASF's actions caused substantial injury. ........................10

         b. Consumers could not reasonably avoid the injuries. ...........14

         c. The substantial injury was not outweighed by any benefits. ...............15

   C. The Court Should Award the Proposed Relief. ..............................16

      1. The proposed injunctive relief is appropriate............................16

2. The Court should order USASF to pay $7,108,323 in restitution.............17

3. The Court should order USASF to pay $25,519,366 in damages.............18

4. The Court should impose a civil money penalty of $10,000,000. ...........29

III. CONCLUSION ......................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Adolph Coors Co. v. Movement Against Racism and the Klan*,
  777 F.2d 1538 (11th Cir. 1985) .....................................................................9

*Allen v. JPMorgan Chase Bank, N.A.*,
  No. 3:12-CV-164-P, 2012 WL 12865210 (N.D. Tex. July 6, 2012).............26

*Am. Fin. Servs. Ass'n v. F.T.C.*,
  767 F.2d 957 (D.C. Cir. 1985).....................................................................14

*Anheuser Busch, Inc. v. Philpot*,
  317 F.3d 1264 (11th Cir. 2003) .....................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................8

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................8

*Buchanan v. Bowman*,
  820 F.2d 359 (11th Cir. 1987) .......................................................................8

*CFPB v. CashCall, Inc.*,
  35 F.4th 734 (9th Cir. 2022) ................................................................... 17, 30

*CFPB v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016) .....................................................................17

*CFPB v. ITT Educ. Servs., Inc.*,
  219 F. Supp. 3d 878 (S.D. Ind. 2015).............................................. 10, 14, 15

*CFPB v. Morgan Drexen, Inc.*,
  No. SACV 13-1267-JLS, 2016 WL 6601650 (C.D. Cal. March 16, 2016)..31

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ....................16

*CFPB v. Siringoringo*,
No. SACV 14–01155 JVS, 2016 WL 102435 (C.D. Cal. Jan. 7, 2016) .......30

*CFPB v. Think Fin., LLC*,
No. 17-cv-127, 2018 WL 734661 (D. Mont. Feb. 6, 2018) .........................16

*Daniels Towing Serv., Inc. v. Nat Harrison Assocs.*,
432 F.2d 103 (5th Cir. 1970) ........................................................................19

*Demitro v. General Motors Acceptance Corp.*,
902 N.E.2d 1163 (Ill. App. Ct. 2009)............................................................14

*Dieffenbach v. Barnes & Noble, Inc.*,
887 F.3d 826 (7th Cir. 2018) ........................................................................19

*F.T.C. v. Accusearch, Inc.*,
No. 06-CV-105-D, 2007 WL 4356786 (D. Wy. Sept. 28, 2007).................11

*F.T.C. v. Amazon.com, Inc.*,
No. C14-1038-JCC, 2016 WL 10654030 (W.D. Wash. July 22, 2016) .......13

*F.T.C. v. Ewing*, No. 2:07-CV-00479-PMP-GWF,
2014 WL 5489210 (D. Nev. Oct. 29, 2014).....................................................8

*F.T.C. v. Figgie Int'l, Inc.*,
994 F.2d 595 (9th Cir. 1993) ...........................................................................8

*F.T.C. v. Fleetcor Tech., Inc.*,
620 F. Supp. 3d 1268 (N.D. Ga. 2022)..........................................................11

*F.T.C. v. RCG Advances, LLC*,
No. 20-CV-4432 (JSR), 2023 WL 6281138 (S.D.N.Y. Sept. 27, 2023).......12

*F.T.C. v. Walmart Inc.*,
No. 22-CV-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023)...................15

*F.T.C. v. Windward Mktg., Inc.*,
    No. 1996-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ...........15

*Frazier v. Absolute Collection Serv., Inc.*,
    767 F. Supp. 2d 1354 (N.D. Ga. 2011)...........................................................8

*Giovanno v. Fabec*,
    804 F.3d 1361 (11th Cir. 2015) .....................................................................8

*Illinois v. Alta Colleges, Inc.*,
    No. 14-CIV-3786, 2014 WL 4377579 (N.D. Ill. Sept. 4, 2014) ..................10

*In re Bishop*,
    296 B.R. 890 (Bankr. S.D. Ga. 2003)...........................................................28

*In re Come,* No. ADV. 07-1084-JMD,
    2008 WL 2018280 (Bankr. D.N.H. May 8, 2008) ........................................26

*In re Lewis*, No. 18-31573,
    2019 WL 2158832 (Bankr. W.D. La. May 16, 2019) ........................... 24, 28

*In re Orkin Exterminating Co.*,
    108 F.T.C. 263 (1986), 1986 WL 722153 ....................................................14

*In re Sanders*, No. 11-32826-DHW,
    2014 WL 2800813 (Bankr. M.D. Ala. Jan. 3, 2014)............................. 19, 24

*In re U.S. Auto Sales, Inc.*, No. 23-11251-TMH (Jointly Administered)
    (Bankr. D. Del. Aug. 25, 2023) ....................................................................17

*In re USASF Servicing, LLC*, No. 23-11256-TMH,
    ECF No. 1 (Bankr. D. Del. Aug. 25, 2023)..................................................32

*Integrity Advance*,
    No. 2015-CFPB-0029 (Jan. 11, 2021)...........................................................30

*Nishimatsu Constr. Co. v. Houston Nat'l Bank*,
    515 F.2d 1200 (5th Cir. 1976) ........................................................................8

*Orkin Exterminating Co. v. F.T.C.*,
    849 F.2d 1354 (11th Cir. 1988) ..................................................... 10, 12, 14

*Rybarczyk v. TRW, Inc.*,
    235 F.3d 975 (6th Cir. 2000) ......................................................................18

*S.E.C. v. Narvett*,
    No. 13-C-927, 2014 WL 5148394 (E.D. Wis. Oct. 14, 2014) ....................32

*Seaton v. Sky Realty Co.*,
    491 F.2d 634 (7th Cir. 1974) ......................................................................26

*S.E.C. v. Asset Recovery & Mgmt. Trust, S.A.*,
    No. 2:02-CV-1372-WKW, 2008 WL 4831738 (M.D. Ala. Nov. 3, 2008)...18

*United States v. Daniel Chapter One*,
    89 F. Supp. 3d 132 (D.D.C. 2015).................................................................32

*United States v. Rent America*,
    734 F. Supp. 474 (S.D. Fla. 1990)................................................................19

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953)......................................................................................16

*Washington v. City Title Loan, LLC*,
    No. CV 16-5427 FMO, 2018 WL 4005447 (C.D. Cal. Feb. 26, 2018) ........28

*Wooten v. McDonald Transit Assocs.*,
    775 F.3d 689 (5th Cir. 2015) ........................................................................8

*Worix v. MedAssets, Inc.*,
    869 F. Supp. 2d 893 (N.D. Ill. 2012)...........................................................12

**Statutes**

11 U.S.C. § 362(b)(4)............................................................2

12 U.S.C. § 5481(5)..............................................................9

12 U.S.C. § 5481(6)(A).........................................................9

12 U.S.C. § 5481(14)...........................................................16

12 U.S.C. § 5481(15)(A)(i)....................................................9

12 U.S.C. § 5531(c).............................................................9

12 U.S.C. § 5565(a)(1).........................................................16

12 U.S.C. § 5536(a)(1)(B)...................................................1, 9

12 U.S.C. § 5565(a)(2).........................................................16

12 U.S.C. § 5565(c)(1).........................................................29

12 U.S.C. § 5565(c)(2).........................................................29

12 U.S.C. § 5565(c)(3).........................................................29

26 U.S.C. § 6621(a)(2).........................................................18

**Other Authorities**

*Westlake Portfolio Management Begins Servicing Loans for U.S. Auto Sales*,

     https://www.businesswire.com/news/home/20230606005835/

     en/Westlake-Portfolio-Management-Begins-Servicing-Loans-

     for-U.S.-Auto-Sales (last visited Nov. 17, 2023) ...........................2

**Regulations**

12 C.F.R. § 1075.103 ................................................................32

12 C.F.R. § 1075.104 ................................................................32

12 C.F.R. § 1083.1(a) ...............................................................29

12 C.F.R. § 1083.1(b) ...............................................................29

17 C.F.R. § 201.600(b) .............................................................18

The Consumer Financial Protection Bureau (Bureau) moves for a default judgment against Defendant under Federal Rule of Civil Procedure 55(b)(2). USASF Servicing, LLC (USASF), an auto-loan servicer, committed five unfair acts and practices in violation of the Consumer Financial Protection Act of 2010 (CFPA).[1] Specifically, USASF: (1) wrongfully activated starter-interrupter devices that warned consumers and disabled their vehicles; (2) failed to return to consumers millions of dollars in refunds of insurance premiums that were not earned; (3) double charged consumers for collateral-protection insurance; (4) misapplied consumer payments; and (5) wrongfully repossessed consumers' vehicles. USASF has defaulted by not defending this action. The Bureau requests that this Court find that USASF violated the CFPA, enjoin USASF from future violations, and order USASF to pay $7,108,323 in restitution, $25,519,366 in damages, and a $10,000,000 civil money penalty.

## I.   BACKGROUND

### A. Procedural History

On August 2, 2023, the Bureau filed its complaint against USASF.[2] On August 3, 2023, the Bureau served the summons and complaint on USASF by

---

[1] 12 U.S.C. § 5536(a)(1)(B).

[2] *See* ECF No. 1.

personal service on its registered agent.[3] USASF failed to defend against the complaint, and on October 10, 2023, the clerk entered default.[4]

## B. Factual Background

USASF serviced car loans originated by its affiliate U.S. Auto Sales, Inc., a buy-here, pay-here car dealer with dealerships throughout the Southeast United States.[5] From at least 2016 until it stopped servicing loans, USASF engaged in a variety of conduct that wrongfully interfered with consumers' use of their vehicles and charged consumers millions of dollars in unearned fees.

### 1. USASF Wrongfully Activated Starter-Interrupter Devices.

A starter-interrupter device (SID) allows an auto-loan servicer to activate warning alerts or disable the car altogether.[6] When USASF activated their warning

---

[3] *See* ECF No. 4.

[4] October 10, 2023 Minute Order. Although USASF has not defended against the complaint, on September 13, 2023 USASF's bankruptcy counsel notified the Court that USASF had filed for Chapter 7 bankruptcy and asserted that certain judicial actions are stayed by the bankruptcy petition. *See* ECF No. 5 at 1. In its response, the Bureau explained that this action is exempt from the automatic stay under 11 U.S.C. § 362(b)(4) because it is an exercise of the Bureau's "police and regulatory power." *See* ECF No. 6 at 2.

[5] Compl. ¶ 2. In April 2023, U.S. Auto Sales shut down its dealerships, and in June 2023, the loans that USASF serviced were transferred to an unaffiliated company, Westlake Portfolio Management. *Westlake Portfolio Management Begins Servicing Loans for U.S. Auto Sales*, https://www.businesswire.com/news/home/20230606005835/en/Westlake-Portfolio-Management-Begins-Servicing-Loans-for-U.S.-Auto-Sales (last visited Nov. 17, 2023).

[6] Compl. ¶ 10.

alerts, a consumer would hear loud beeps for ten seconds every time the consumer turned their vehicle on or off.[7] When USASF activated the disabling function, a consumer would not be able to use their vehicle.[8]

USASF's written procedures dictated that the company would activate warning alerts as soon as a consumer was late on a payment, for up to four days, and then disable the vehicle on the fifth day unless the consumer had paid or promised to pay.[9] But owing to programming, system, and human errors, USASF erroneously disabled consumers' vehicles at least 7,523 times and erroneously activated warning alerts at least 71,415 times.[10] The erroneous alerts typically lasted three days.[11]

### 2. USASF Failed to Refund Unearned Fees.

U.S. Auto Sales sold an add-on product called Guaranteed Asset Protection (GAP) to about 64,000 consumers from February 2017 until August 2021.[12] GAP is intended to cover a deficiency balance if a car is totaled and the consumer still

---

[7] *Id.* ¶ 12; Declaration of Cynthia Borders (Borders Decl.), Attachment A, ¶ 5.
[8] Compl. ¶ 10.
[9] *Id.* ¶¶ 13, 17.
[10] *Id.* ¶¶ 14-17; Declaration of Nicole Kelly (Kelly Decl.), Attachment B, ¶¶ 10, 14.
[11] Compl. ¶ 18; Kelly Decl. ¶¶ 15-17.
[12] Compl. ¶ 23.

owes money on their loan after the auto-insurance payout.[13] U.S. Auto Sales added the cost of the GAP premium to the car loans that USASF serviced.[14]

When USASF repossessed cars from consumers before the end of their loan term, their GAP coverage became void and worthless because the consumer no longer had the car.[15] Since the premium was based on the entire loan term and the product became void early, some of the premiums paid by consumers were eligible to be refunded by the company administering the product.[16] USASF's policy was to obtain this refund and apply it to reduce the consumer's outstanding loan balance, but USASF failed to do so for 2,875 consumers, resulting in over $1,403,949 million in inflated loan balances for consumers.[17]

USASF also regularly failed to refund GAP premiums when consumers paid off their loans early. At early payoff, USASF requested a payoff amount that included GAP premiums for the full loan term, and so the consumer was owed a refund of the portion of the GAP premium that was unearned.[18] When a *third party* paid off a consumer's loan early, such as a lender paying off the loan during a refinance, USASF obtained this refund from the GAP administrator, and in doing

---

[13] *Id.* ¶ 22.
[14] *Id.* ¶ 24.
[15] *Id.* ¶¶ 25, 26, 29.
[16] *Id.* ¶ 26.
[17] *Id.* ¶¶ 27-28; Kelly Decl. ¶¶ 35, 43.
[18] Compl. ¶ 30.

so correctly used the date of the loan payoff as the date the GAP was cancelled.[19] In contrast, when a *consumer* paid off their loan early, USASF did not obtain a refund unless the consumer specifically requested one—even though USASF did not need a consumer request in order to obtain the refund.[20] As a result of this needless requirement, USASF failed to provide refunds of unearned GAP premiums and interest totaling at least $3,144,100 for 5,689 consumers.[21] And when USASF did request a refund of unearned GAP premiums for a consumer after early payoff, it used the date of the consumer's refund request (rather than the payoff date) as the date the GAP was cancelled.[22] This practice resulted in refunds to 5,101 consumers that were, in aggregate, short by $1,285,917.[23]

### 3. USASF Double Billed Consumers for Insurance.

Collateral-protection insurance (CPI) is physical-damage insurance that protects the lender if the consumer does not have adequate auto insurance.[24] When U.S. Auto Sales placed CPI on consumers' accounts, USASF charged the consumer and collected payments for it, which cost on average $100 per month.[25]

---

[19] *Id.* ¶ 31.
[20] *Id.* ¶ 32.
[21] *Id.* ¶ 33; Kelly Decl. ¶¶ 35, 44.
[22] Compl. ¶¶ 32-33.
[23] Kelly Decl. ¶ 47.
[24] Compl. ¶ 37.
[25] *Id.* ¶¶ 38-39.

From December 2015 through August 2021, USASF double billed

consumers for CPI in error at least 34,000 times, totaling around $1.9 million in

over-collection.[26] From 2015 to 2019, it often took more than 60 days for USASF

to correct its double-billing error, thereby depriving thousands of consumers access

to their funds for a significant length of time.[27] From 2019 to 2021, USASF

averaged over 120 days to correct its double-billing error.[28] In over 5,800

instances, USASF failed to correct its double-billing error for more than a year.[29]

### 4. USASF Misapplied Consumer Payments.

The contracts that USASF serviced required it to apply any payments above

the regularly scheduled amount first to accrued interest.[30] But USASF often

mistakenly applied extra payments first to late fees or CPI.[31] USASF misapplied at

least 8,738 extra payments over nearly five years, resulting in consumers paying

approximately $1.2 million in interest and fees that they did not owe.[32]

### 5. USASF Wrongfully Repossessed Vehicles.

USASF's policy was to repossess a vehicle if a consumer missed a deferred

---

[26] *Id.* ¶ 40.
[27] *Id.* ¶ 41.
[28] *Id.* ¶ 41.
[29] *Id.* ¶ 42.
[30] *Id.* ¶ 48.
[31] *Id.* ¶ 48.
[32] *Id.* ¶¶ 49-50.

down payment (a down payment after taking possession of the vehicle but before the first installment payment) or once a consumer was sixty days past due.[33] USASF contracted with two vendors that repossessed cars on USASF's behalf.[34] In some circumstances, USASF put a pause on a repossession it had ordered by communicating a "hold" to the repossession vendors through a software platform.[35] Under USASF policy, a hold should have been triggered when: (a) a consumer paid or promised to pay; (b) a consumer entered bankruptcy; (c) USASF agreed to defer (or further defer) a payment; or (d) the consumer was on active military duty.[36] But due to USASF's failure to internally flag activities that should have triggered a hold (such as a payment), its failure to communicate holds to its repossession vendors, and various other errors, USASF erroneously repossessed at least 103 vehicles.[37]

---

[33] *Id.* ¶ 53.
[34] *Id.* ¶ 55.
[35] *Id.* ¶ 56.
[36] *Id.* ¶¶ 57-59.
[37] *Id.* ¶¶ 60-71. USASF admitted to the Bureau that it wrongfully repossessed 78 vehicles through August 2021, Compl. ¶ 70, but a former company supervisor, Timothy Jones, attests that, during just the two years he worked at USASF, he reviewed the files of "hundreds of consumers whose cars were repossessed improperly." Declaration of Timothy Jones (Jones Decl.), Attachment C, ¶¶ 4-8. The Bureau also analyzed Sentinel complaints and found at least another 25 consumers, not already disclosed by USASF, whose cars were improperly repossessed based on USASF's repossession policies. *See* Declaration of Dani Schneider (Schneider Decl.), Attachment D, ¶¶ 8-10. Courts routinely consider

## II.  ARGUMENT

### A. Legal Standard for Default Judgments

A defaulting defendant "admits the plaintiff's well-pleaded allegations of fact" for purposes of liability.[38] A default judgment as to liability, then, is warranted if the pleadings contain "a sufficient basis" to establish a violation, an analysis that mirrors a motion to dismiss under Rule 12(b)(6).[39] When evaluating a motion to dismiss, a court looks at whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[40] In addition to the complaint, the court can consider facts in declarations.[41]

After determining liability, the court may award relief, including monetary damages, if there is a sufficient factual basis.[42] The court may conduct a hearing on damages, but "Rule 55(b)(2) does not require a damages hearing in every case."[43]

---

facts in complaints like this under the residual hearsay exception. *See, e.g.*, *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993); *F.T.C. v. Ewing*, No. 2:07-CV-00479-PMP-GWF, 2014 WL 5489210, at *2 (D. Nev. Oct. 29, 2014).

[38] *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (quoting *Nishimatsu Constr. Co., Ltd. V. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1976)).

[39] *Nishimatsu*, 515 F.2d at 1206; *Wooten v. McDonald Transit Assocs.*, 775 F.3d 689, 695 (5th Cir. 2015).

[40] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[41] *Frazier v. Absolute Collection Serv., Inc.*, 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011).

[42] *See Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003).

[43] *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015).

Instead, the plaintiff can submit "detailed affidavits establishing the facts necessary to support entitlement to the damages requested."[44]

## B. Default Judgment on Liability is Warranted.

### 1. USASF is subject to the CFPA's unfairness prohibition.

The CFPA prohibits any "covered person" from engaging in an unfair act or practice "in connection with any transaction with a consumer for a consumer financial product or service."[45] A "covered person" includes "any person that engages in offering or providing a consumer financial product or service,"[46] which in turn includes servicing loans that are primarily for personal, family, or household purposes.[47] USASF is a covered person because it serviced car loans that were used by consumers for personal, family, or household purposes.[48]

### 2. USASF committed unfair acts and practices.

An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers; or (3) outweighed by countervailing benefits to consumers or competition.[49] The five acts

---

[44] *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985).
[45] 12 U.S.C. § 5536(a)(1)(B).
[46] 12 U.S.C. § 5481(6)(A).
[47] 12 U.S.C. §§ 5481(5), (15)(A)(i).
[48] Compl. ¶ 9.
[49] 12 U.S.C. § 5531(c).

or practices described in the complaint each meet this standard.

### a. USASF's actions caused substantial injury.

An injury is substantial if a large number of people each suffer a small harm, or a small number of people experience a large harm.[50] Each of the five acts at issue caused consumers substantial injury.

Count I: wrongful activation of SIDs. USASF's wrongful disables caused consumers to lose use of their vehicles at least 7,523 times.[51] These consumers lost wages and work,[52] were stranded away from home,[53] missed class,[54] spent money

---

[50] *Orkin Exterminating Co. v. F.T.C.*, 849 F.2d 1354, 1365 (11th Cir. 1988) (FTC's Policy Statement on Unfairness "makes clear that injury may be sufficiently substantial if it causes small harm to a large class of people"); *Illinois v. Alta Colleges, Inc.*, No. 14-CIV-3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) (the CFPA's prohibition of unfairness is virtually identical to the FTCA prohibition); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015) (under the standard borrowed from the FTCA, "the harm involved need not be massive on an annual basis" to qualify as substantial injury).

[51] Compl. ¶¶ 14, 19; Kelly Decl. ¶ 10.

[52] Declaration of Angel Carter (A. Carter Decl.), Attachment E, ¶ 12; Declaration of Victoria Carter (V. Carter Decl.), Attachment F, ¶¶ 5, 11; Declaration of Dee Ann Foster (Foster Decl.), Attachment G, ¶ 7; Declaration of Yami Roberts (Roberts Decl.), Attachment H, ¶ 4; Declaration of Latoya Strickland (Strickland Decl.), Attachment I, ¶ 5; Declaration of LaMorica Swain (Swain Decl.), Attachment J, ¶ 7; Declaration of Jesse Winston (Winston Decl.), Attachment K, ¶ 7.

[53] Declaration of Brittany Best (Best Decl.), Attachment L, ¶ 5; Borders Decl. ¶ 6; A. Carter Decl. ¶ 15; Foster Decl. ¶¶ 6, 8; Declaration of Martina Wilson Johnson (Johnson Decl.), Attachment M, ¶ 8; Jones Decl. ¶ 12; Winston Decl. ¶ 5.

[54] Schneider Decl. ¶ 22.

on other transportation,[55] were unable to get their children to and from school,[56] suffered embarrassment and distress,[57] spent time contacting USASF,[58] overpaid USASF in an effort to reverse the disable,[59] and had their physical health put at risk.[60] When USASF wrongfully activated warning alerts at least 71,415 times, consumers spent time contacting USASF to try to resolve the problem, overpaid USASF to stop the alerts,[61] and suffered distress, embarrassment, and confusion.[62] These harms constitute substantial injury.[63]

---

[55] Roberts Decl. ¶ 4; Strickland Decl. ¶ 5.

[56] A. Carter Decl. ¶ 10; V. Carter Decl. ¶¶ 10, 13; Jones Decl. ¶ 12; Roberts Decl. ¶ 4; Strickland Decl. ¶ 5; Swain Decl. ¶ 7; Winston Decl. ¶ 6.

[57] Best Decl. ¶¶ 5-7; Borders Decl. ¶¶ 7-8; A. Carter Decl. ¶ 10; V. Carter Decl. ¶¶ 13, 15-16; Foster Decl. ¶¶ 6-7, 9, 11; Johnson Decl. ¶¶ 8-9; Jones Decl. ¶¶ 12, 18-19; Roberts Decl. ¶ 5; Strickland Decl. ¶ 8; Swain Decl. ¶ 8; Winston Decl. ¶¶ 4-5, 8.

[58] Best Decl. ¶ 5; Borders Decl. ¶ 6; A. Carter Decl. ¶¶ 8-11; V. Carter Decl. ¶¶ 6-7, 11-13; Foster Decl. ¶¶ 5, 7-8; Johnson Decl. ¶ 8; Jones Decl. ¶¶ 5-7, 12-13, 16; Roberts Decl. ¶¶ 4-5; Declaration of Nancy Smith (Smith Decl.), Attachment N, ¶ 5; Schneider Decl. ¶¶ 20-25; Strickland Decl. ¶¶ 6-7; Swain Decl. ¶¶ 6-8; Winston Decl. ¶¶ 4-8.

[59] A. Carter ¶ 14; V. Carter Decl. ¶¶ 11, 14; Jones Decl. ¶¶ 15-17; Schneider Decl. ¶ 22.

[60] V. Carter Decl. ¶ 15; Foster Decl. ¶¶ 6, 8; Schneider Decl. ¶ 22.

[61] Jones Decl. ¶¶ 15-17.

[62] Compl. ¶¶ 14, 19; Best Decl. ¶ 4; Borders Decl. ¶¶ 4-5, 7-8; A. Carter Decl. ¶¶ 6-7, 13; V. Carter Decl. ¶ 15; Foster Decl. ¶¶ 9, 11; Johnson Decl. ¶¶ 4-7, 9; Jones Decl. ¶¶ 5, 12, 16; Roberts Decl. ¶¶ 6-7; Strickland Decl. ¶¶ 5-6; Swain Decl. ¶¶ 5, 8.

[63] *See, e.g.*, *F.T.C. v. Fleetcor Tech., Inc.*, 620 F. Supp. 3d 1268, 1322 (N.D. Ga. 2022) (time spent contacting company and seeking refunds can be substantial injury); *F.T.C. v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *8

Count II: failure to ensure refunds of unearned GAP premiums. USASF's failure to refund unearned GAP premiums cost consumers $5,833,966 in total,[64] including $1,403,949 for 2,875 consumers whose loans were charged off and faced inflated loan balances,[65] $3,144,100 for 5,689 consumers whose accounts were paid off early and did not receive any refund,[66] and $1,285,917 for 5,101 consumers who received an inaccurately low refund.[67] This qualifies as substantial injury.[68]

Count III: double billing of insurance. USASF double billed consumers for CPI fees in approximately 34,000 instances, resulting in overcollection of $1.9 million from consumers.[69] Some of those consumers became delinquent as a result and then had their cars repossessed or disabled and faced erroneous debt-collection

---

(D. Wy. Sept. 28, 2007) (significant emotional harms can constitute substantial injury); *F.T.C. v. RCG Advances, LLC*, No. 20-CV-4432 (JSR), 2023 WL 6281138, at *7-8 (S.D.N.Y. Sept. 27, 2023) (financial, reputational, and emotional harms constitute substantial injury); *Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893, 900-901 (N.D. Ill. 2012) (lost wages as substantial injury under state UDAP).
[64] Kelly Decl. ¶ 48.
[65] *Id.* at ¶ 43.
[66] *Id.* at ¶ 44.
[67] *Id.* at ¶ 47.
[68] *See, e.g., Orkin*, 849 F.2d at 1365 (collecting $7 million in unearned revenue from consumers over a period of 4 years was substantial).
[69] Compl. ¶¶ 40, 45.

efforts.[70] This overcollection and subsequent harm constitutes substantial injury.[71]

Count IV: misapplication of consumer payments. When USASF misapplied consumer payments at least 8,738 times over five years, the company caused substantial injury by collecting $1.2 million in erroneous charges.[72]

Count V: wrongful repossessions. USASF's wrongful repossessions resulted in at least 103 consumers losing access to their cars—sometimes for days and other times permanently.[73] As a result, consumers lost wages,[74] lost a job,[75] spent money on other transportation,[76] had their vehicles damaged,[77] got evicted,[78] spent time contacting USASF,[79] had difficulty getting their children to and from school,[80] had

---

[70] A. Carter Decl. ¶ 5; V. Carter Decl. ¶¶ 11, 15.

[71] *F.T.C. v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) ("Courts have repeatedly held that billing customers without permission causes injury for the purposes of asserting" an unfairness claim.).

[72] Compl. ¶ 95; *Amazon.com*, 2016 WL 10654030, at *8.

[73] *See* note 37, *supra*; Declaration of Nikeya Nettles (Nettles Decl.), Attachment O, ¶¶ 9-10; Smith Decl. ¶¶ 6, 8-9; Declaration of Marquisha Swanson (Swanson Decl.), Attachment P, ¶ 9.

[74] Jones Decl. ¶ 11; Nettles Decl. ¶ 15.

[75] Nettles Decl. ¶¶ 14-15.

[76] Declaration of Javaria Williams Keesee (Keesee Decl.), Attachment Q, ¶ 8; Nettles Decl. ¶ 15; Declaration of Darwin Gonzalez Rodriguez (Rodriguez Decl.), Attachment R, ¶ 5; Smith Decl. ¶¶ 7, 12; Swanson Decl. ¶ 9.

[77] Nettles Decl. ¶¶ 11-12; Smith Decl. ¶ 7.

[78] Nettles Decl. ¶ 16.

[79] Jones Decl. ¶¶ 5-7; Rodriguez Decl. ¶ 5; Smith Decl. ¶¶ 8-9; Swanson Decl. ¶ 8.

[80] Jones Decl. ¶ 11; Smith Decl. ¶ 12.

their physical health put at risk,[81] and suffered emotional distress.[82] USASF's

wrongful repossessions, then, caused substantial injury.[83]

### b. Consumers could not reasonably avoid the injuries.

Consumers are only able to reasonably avoid an injury "before it occurs if

they have reason to anticipate the impending harm and the means to avoid it," or if

they are aware of potential avenues to mitigate the damage after it occurs.[84]

Consumers are not able to avoid an injury if the company's actions prevent them

from making a "free and informed [] choice."[85]

Consumers could not avoid their injuries here. They had no reason to expect,

and no control over, USASF erroneously repossessing their cars or activating SIDs,

failing to provide accurate GAP refunds, double billing them, or misapplying their

payments.[86] Even consumers who theoretically could have avoided some harm by

affirmatively requesting a GAP refund could not *reasonably* do so. These

---

[81] Keesee Decl. ¶ 8.

[82] Jones Decl. ¶¶ 11, 19; Keesee Decl. ¶¶ 8-9; Nettles Decl. ¶¶ 14-17; Rodriguez Decl. ¶ 5; Smith Decl. ¶¶ 7, 12; Swanson Decl. ¶ 7.

[83] *See* note 63, *supra*; *see also Demitro v. General Motors Acceptance Corp.*, 902 N.E.2d 1163, 1169 (Ill. App. Ct. 2009) (consumer who had their vehicle wrongfully repossessed and credit damaged suffered substantial injury under state UDAP).

[84] *Orkin*, 849 F.2d at 1365 (quoting *In re Orkin Exterminating Co.*, 108 F.T.C. 263 (1986), 1986 WL 722153).

[85] *ITT*, 219 F. Supp. 3d at 916; *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 972 (D.C. Cir. 1985); *Orkin*, 849 F.2d at 1365.

[86] Compl. ¶¶ 20, 35, 46, 51, 73.

consumers had no reason to anticipate that USASF would charge them at early payoff for premiums for a now worthless product (since they were no longer in need of a GAP policy), or that USASF required a refund request even though it already had all the information it needed to provide the refund.[87] By not telling consumers they had collected money for a void product and then enacting a needless hurdle to obtaining a refund of that money, USASF "unreasonably create[d] or [took] advantage of an obstacle to the free exercise of consumer decision-making."[88] Thus, as a practical matter, these consumers "lacked a free choice" to demand the refunds they were owed.[89]

### c. The substantial injury was not outweighed by any benefits.

"[W]hen a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the unfairness of the practice is not outweighed."[90] That is

---

[87] *Id.* ¶ 35.

[88] *F.T.C. v. Walmart Inc.*, No. 22-CV-3372, 2023 WL 2646741, at *19 (N.D. Ill. Mar. 27, 2023) (consumers could not reasonably avoid injury when Walmart failed to warn consumers about potential fraud or provide them with avenues to mitigate their losses) (quoting 1980 FTC Unfairness Policy Statement).

[89] *ITT*, 219 F. Supp. 3d at 916.

[90] *F.T.C. v. Windward Mktg., Inc.*, No. 1996-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997).

the case here. USASF's errors severely harmed consumers without any accompanying benefit to them or competition among car-loan servicers.[91]

## C. The Court Should Award the Proposed Relief.

This Court may "grant any appropriate legal or equitable relief" for a violation of the CFPA.[92] Relief may include restitution, money damages, limits on the company's activities or functions, and civil money penalties.[93] Here, the Bureau seeks a permanent injunction against unlawful conduct, restitution and damages for harmed consumers, and a civil money penalty.

### 1. The proposed injunctive relief is appropriate.

The Bureau seeks a permanent injunction to protect consumers from future harm. A permanent injunction is appropriate when there is a "cognizable danger of recurrent violation," even if the illegal conduct has stopped.[94] A court can enjoin a defendant after it has filed for bankruptcy.[95]

---

[91] *See, e.g.*, C*FPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) (rejecting defendant's suggestion of countervailing benefits because "[l]osing money they are otherwise entitled to keep provides consumers no conceivable benefit . . . .").

[92] 12 U.S.C. § 5565(a)(1); 12 U.S.C. § 5481(14) (federal consumer financial law includes the provisions of the CFPA).

[93] 12 U.S.C. § 5565(a)(2).

[94] *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

[95] *See CFPB v. Think Fin., LLC*, No. 17-cv-127, 2018 WL 734661, at *4 (D. Mont. Feb. 6, 2018) (CFPB's lawsuit seeking injunctive and other relief was not stayed by company's bankruptcy filing).

For years, USASF injured thousands of consumers through a host of errors. Although USASF is currently in bankruptcy proceedings, its assets have not yet been liquidated and it has not dissolved.[96] The Bureau therefore requests that the Court permanently enjoin USASF from wrongfully activating SIDs, failing to refund unearned GAP fees, overbilling consumers for insurance, misapplying consumer payments, or wrongfully repossessing vehicles.

### 2. The Court should order USASF to pay $7,108,323 in restitution.

The Bureau seeks legal restitution for USASF's failure to refund unearned GAP premiums (Count II).[97] Restitution "ensure[s] that consumers are made whole when they have suffered a violation of the statute,"[98] and so may be calculated based on the "full amount lost by consumers."[99]

Due to USASF's failure to refund unearned GAP premiums, consumers are owed $5,833,966 in refunds.[100] In addition to awarding this as restitution, the Court may award prejudgment interest, which takes into account the current value of the

---

[96] *See In re U.S. Auto Sales, Inc.*, No. 23-11251-TMH (Jointly Administered) (Bankr. D. Del. Aug. 25, 2023) (bankruptcy cases of U.S. Auto companies, including USASF, is ongoing).

[97] USASF already returned money to consumers who were overcharged for CPI (Count III) and whose payments were misapplied (Count IV). Therefore, the Bureau does not seek restitution for these practices.

[98] *CFPB v. CashCall, Inc.*, 35 F.4th 734, 750 (9th Cir. 2022).

[99] *CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016).

[100] *See* nn. 64-67, *supra*.

money owed to consumers.[101] In setting the interest rate, the Court is not bound by a particular statute, but can take guidance from the S.E.C. rules regarding prejudgment interest on disgorgement.[102] Using that approach, consumers are owed $1,274,357 in prejudgment interest.[103]

In total, the Bureau seeks restitution of $5,833,966 for USASF's failure to refund unearned GAP premiums, plus prejudgment interest of $1,274,357, for total restitution of $7,108,323.[104]

### 3. The Court should order USASF to pay $25,519,366 in damages.

The Bureau seeks monetary damages for USASF's wrongful activation of SIDs (Count I) and wrongful repossessions (Count V). Monetary damages are justified by, among other harms, lost wages, out-of-pocket costs, emotional

---

[101] *See, e.g.*, *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985-6 (6th Cir. 2000) (holding that the court has discretion to determine a prejudgment interest rate "in accordance with general equitable principles") (internal citation omitted).
[102] *See* 17 C.F.R. § 201.600(b) ("Interest on the sum to be disgorged shall be computed at the underpayment rate of interest established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), and shall be computed quarterly."); *see also S.E.C. v. Asset Recovery & Mgmt. Trust, S.A.*, No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *10 (M.D. Ala. Nov. 3, 2008) (ordering disgorgement and prejudgment interest calculated at the IRS underpayment rate).
[103] Kelly Decl. ¶¶ 49-52.
[104] *Id.* ¶¶ 48, 52.

distress, and time spent to correct errors.[105] Courts may reasonably estimate

damages if the precise amount is not known.[106]

To reasonably estimate harm, the Bureau has grouped USASF's unlawful

conduct into three categories that caused similar types of harms: wrongful disables,

wrongful activation of warning alerts, and wrongful repossessions.

<u>Wrongful disables</u>. Consumers whose cars were erroneously disabled

suffered a variety of harms. For one, some lost hundreds of dollars in wages with

each wrongful disable.[107] One consumer, for example, commuted over an hour to

his job as a truck driver, and whenever he was late for work because of an

erroneous disable—which happened at least six times—he missed an entire day

---

[105] *See, e.g.*, *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828-29 (7th Cir. 2018) ("[T]he value of one's own time needed to set things straight is a loss from an opportunity-cost perspective. These injuries can justify money damages . . . ."); *In re Sanders*, No. 11-32826-DHW, 2014 WL 2800813, at *5 (Bankr. M.D. Ala. Jan. 3, 2014) (awarding lost wages and mental anguish where consumer's vehicle was wrongfully repossessed for one day); *United States v. Rent America*, 734 F. Supp. 474, 482 (S.D. Fla. 1990) (the term "monetary damages" includes compensatory damages for emotional distress).
[106] *See, e.g., Daniels Towing Serv., Inc. v. Nat Harrison Assocs.*, 432 F.2d 103, 105-106 (5th Cir. 1970).
[107] *See* A. Carter Decl. ¶ 12 (lost wages of $100 to $200 per erroneous disable); Foster Decl. ¶ 7 (lost around $2,400 in wages in total from erroneous disables); Winston Decl. ¶ 7 (lost a day's pay of around $270); Strickland Decl. ¶ 5 (lost around $170 in wages for the day); V. Carter Decl. ¶¶ 5, 11 (lost around $200 in wages each time); Schneider Decl. ¶ 23 (consumer lost a day of pay because of wrongful disable).

because his employer sent out a replacement driver.[108] Second, consumers paid

out-of-pocket costs, including day-care expenses,[109] pet-boarding fees,[110] and

alternative transportation.[111] Third, consumers spent unreasonably long amounts of

time contacting USASF or waiting for the company to reactivate their cars.[112]

Finally, consumers suffered significant emotional distress. One consumer

was "scared out of [her] mind" when her car was disabled while driving on the

highway with her children.[113] USASF made customers so "irate" with its frequent

mistakes that the company's employees joked that a customer "might come and

blow up our offices" and the company had to provide phone de-escalation

---

[108] Foster Decl. ¶ 7.

[109] V. Carter Decl. ¶ 5 (paid around $30 in daycare fees); Roberts Decl. ¶ 4 (paid about $500 in added childcare and driving expenses).

[110] *See* Foster Decl. ¶ 6 (paid extra to board dogs when stranded out of town).

[111] *See* Strickland Decl. ¶ 5 (paid $20 for a neighbor to take her child to school when her car was disabled); Roberts Decl. ¶4 (paid around $500 in added childcare and driving expenses); Schneider Decl. ¶ 24 (consumer "accumulated huge fees" for rideshare).

[112] *See, e.g.*, Foster Decl. ¶¶ 5, 7 ("Each time I would call USASF and be put on hold for about two hours."); Roberts Decl. ¶ 5 (waited for close to an hour on hold with USASF); Johnson Decl. ¶ 8 (waited hours for USASF to turn her car back on); Winston Decl. ¶¶ 5-8 (having to wait for about 30 minutes to reach a customer service representative on multiple occasions); Strickland Decl. ¶¶ 4,6 (it could take about two hours to reach a representative); Jones Decl. ¶ 5 ("The phone system . . . was out of date, and many customers waited on hold for at least 30 minutes. Many customers would get disconnected when they were next in the phone queue."); Schneider Decl. ¶ 24 (consumer waited over six weeks for USASF's vendor to fix a malfunctioning SID that had disabled the vehicle).

[113] V. Carter Decl. ¶ 15.

trainings.[114] Consumers who were made late for work feared losing their jobs.[115]

Those who missed their children's school pickup or drop-off feared dire

consequences such as losing their kids to child-protective services.[116] Consumers

who were left stranded feared for their safety, going so far as to adjust their

schedules or make extra payments to USASF to avoid danger,[117] and were

humiliated, angry, and anxious.[118] Some were stranded far from home. One couple,

for example, was stranded for days in the heat in an unfamiliar town in Arkansas,

---

[114] Jones Decl. ¶ 18; A. Carter Decl. ¶ 10 ("I would start off patient and I would explain the problem to them. But after going through three people to clarify, and only then would they realize it was their mistake, I would end up irate.").

[115] *See* Strickland Decl. ¶ 8 ("I was living in fear that I couldn't trust USASF to process my payments properly and that they would put me in jeopardy of losing my job."); V. Carter Decl. ¶ 12 (USASF's mistakes were putting her job at risk); Schneider Decl. ¶ 25 (wrongful disable was affecting consumer's job).

[116] *See* A. Carter Decl. ¶ 10 ("After a while, if I don't show up, the school will call child protective services."); Winston Decl. ¶ 6 (fearful that he would go to jail and lose his kids because of repeated tardiness caused by U.S. Auto); V. Carter Decl. ¶ 10 (explaining her children rely on her to drive them to school and daycare).

[117] *See* A. Carter Decl. ¶ 14 (made extra payments for several months out of fear that her son would not be able to get home from basketball practice late at night); Borders Decl. ¶¶ 6-7 (stopped going to the store after 5 p.m. and started taking only day shifts at work after being stranded at a grocery store); V. Carter Decl. ¶ 11 ("I made a payment even though I should not have had to because I needed to be able to use my car."). *See also* Jones Decl. ¶ 17 (USASF consumers overpaid their accounts to stop or prevent erroneous beeping or disabling).

[118] Best Decl. ¶¶ 5-7 (had to increase her anxiety medication after being stranded for nearly an hour at night in a parking lot where murders were known to happen); Foster Decl. ¶ 8 (humiliated by being stranded at work); Jones Decl. ¶ 12 (Collections manager recalls "numerous customers telling [him] that they were stuck at Walmart or couldn't pick up their kids because their car was improperly disabled," making them "understandably upset.").

unable to get home to Alabama.[119] When they contacted USASF, they were told that the situation could not be fixed until Monday because the relevant employees "were gone for the weekend."[120] Having not budgeted for the extended stay, they were forced to sleep in their car for three nights in a parking lot, eat minimally, and shower at a truck stop, until a USASF representative was available on Monday to activate their car after confirming that the company had disabled it in error.[121] The ordeal left them in worse health, exhausted, afraid, infuriated, and embarrassed.[122]

In short, USASF's wrongful deactivations left many consumers furious,[123] afraid,[124] stressed,[125] and embarrassed[126]—and not only on the days of the

---

[119] Foster Decl. ¶¶ 4-6.

[120] *Id.* ¶ 5.

[121] *Id.* ¶ 6.

[122] *Id.*

[123] *See* A. Carter Decl. ¶ 10 (tried to be patient with customer service but would end up "irate."); Foster Decl. ¶¶ 6, 8 (experience was an infuriating ordeal); V. Carter Decl. ¶¶ 11, 13 (furious about having to make an extra payment and that her son's education was being affected by USASF's errors); Schneider Decl. ¶ 21 (consumer was "livid" when USASF disabled her car after she fully paid it off).

[124] *See* Borders Decl. ¶¶ 7-8 ("I was afraid of not being able to get home after work or get to work if my car was improperly disabled. . . . It was disruptive to my life and my mental health . . . ."); Foster Decl. ¶ 6 (feared for her and her husband's safety when stranded away from home); Schneider Decl. ¶ 22 (consumer feared she would not be able to take her daughter with sickle-cell disease to the doctor or emergency room).

[125] Borders Decl. ¶¶ 6-8; Winston Decl. ¶ 4 (frustrated over seven disables even though she paid on time).

[126] A. Carter Decl. ¶ 13 (felt embarrassed when her son asked questions about the SID warning alerts); Borders Decl. ¶ 7 (felt humiliated having to ask for rides from

wrongful disables, but for long stretches because they never knew when USASF might shut off their car.[127]

Despite the Bureau's request, USASF did not provide information showing how long each erroneous disable lasted.[128] The Bureau's damages estimate is based on the range of monetary losses consumers reported.[129] For example, one couple lost around $2,400 in wages and paid for extra days of dog boarding,[130] one parent lost wages and paid around $500 in added childcare and driving expenses,[131] and another lost $200 in wages and $30 in daycare fees for the first disable and another $200 in wages a second time.[132] The Bureau estimates that each erroneous disable

---

friends when her vehicle was improperly beeping or disabled); Foster Decl. ¶¶ 7, 9 (felt embarrassed having to tell his boss that his car would not start); Swain Decl. ¶ 5 (felt too embarrassed to drive her kids to school for fear the beeping could be heard in the carpool lane); Johnson Decl. ¶¶ 6-8 (embarrassed to have family and passengers in the car because of the beeping, and embarrassed at work while waiting in the parking lot for hours for USASF to resolve the erroneous disable); Winston Decl. ¶ 5 (embarrassed by having to sit in his car in his work parking lot).
[127] *See, e.g.*, A. Carter Decl. ¶ 14 (never sure whether her son would be able to make it home from basketball practice late at night); Borders Decl. ¶ 7 (had anxiety that if her car wouldn't start she would be "stuck in an unsafe situation"); Strickland Decl. ¶ 8 ("Having an unreliable car was stressful as a single parent and I would wake up afraid that I couldn't take my children to childcare if my car wasn't working."); V. Carter Decl. ¶ 16 (suffered daily stress over not knowing whether her car would engage every morning before work).
[128] Declaration of Elena González (González Decl.), Attachment S, ¶¶ 5-7.
[129] *See* nn. 107 (lost wages), 109 (daycare) and 111 (alternate transportation), *supra*.
[130] Foster Decl. ¶¶ 6-7.
[131] Roberts Decl. ¶ 4.
[132] V. Carter Del. ¶¶ 5, 11.

(regardless of how long it lasted) caused, on average, $500 in monetary harm.[133]

USASF erroneously disabled consumers' cars 7,523 times,[134] yielding un-remediated damages of approximately $3,760,266 for this group of consumers.[135]

Wrongful activations of warning alerts. When USASF erroneously activated warning alerts, consumers were forced to spend inordinate amounts of time trying to get the company to fix its mistake—including waiting on hold for hours in some cases just to reach a representative,[136] being disconnected by USASF when they were next in line to speak with a representative,[137] and being forced to speak with

---

[133] Courts have awarded significantly higher damages from wrongful repossessions, which, like wrongful disables, cause consumers to lose the use of their cars. *See, e.g.*, *In re Lewis*, 2019 WL 2158832, at *9-10 (Bankr. W.D. La. May 16, 2019) (awarding, among other damages, $312 for lost wages, $698 in out-of-pocket costs for alternate transportation, and $3,000 in emotional distress); *In re Sanders*, No. 11-32826-DHW, 2014 WL 2800813, at *5 (Bankr. M.D. Ala. Jan. 3, 2014) (awarding $72 for lost wages and $2,500 for mental anguish, in addition to other damages). While USASF had no policy to reimburse customers for erroneous SID activations, the company provided compensation in isolated instances. Kelly Decl. ¶ 11. V. Carter Decl. ¶¶ 5-8; Jones Decl. ¶ 17.

[134] Compl. ¶¶ 14, 19; Kelly Decl. ¶ 10.

[135] Kelly Decl. ¶ 13 (total harm was $3,761,500, but USASF reported that it already provided remediation of $1,234).

[136] Borders Decl. ¶¶ 4, 5, 8 (having to call customer service each time she heard the warning alerts, which was every two weeks for over two years, disrupted her life); Johnson Decl. ¶ 8 (waited on hold for nearly an hour before reaching a customer service representative); Roberts Decl. ¶¶ 5-6 (waited on hold for about an hour on multiple occasions); Swain Decl. ¶¶ 5, 8 (describing having to wait until after 9 am to reach a representative).

[137] Jones Decl. ¶ 5.

multiple people before USASF would admit its mistake.[138] And it was "common" for consumers to call back a second time on the same day "because the SID was so antiquated" that the code provided by USASF to deactivate it did not work.[139]

Consumers who experienced erroneous alerts also suffered significant emotional distress. The warnings were extremely loud.[140] Consumers were distracted when they drove.[141] They were embarrassed and humiliated because the alerts made others think they had not paid their bills.[142] One consumer, for example, was too embarrassed to drive her kids to school out of fear that other drivers would hear the alerts.[143] Another consumer was "very stressed" when she had to wait for about an hour for USASF to disable the warning alerts in the

---

[138] A. Carter Decl. ¶¶ 7, 9, 11 (had to wait on hold for up to thirty minutes when calling to get the company to stop the warning beeps on around fifteen occasions, and then spent unnecessary time on customer-service escalations).

[139] Jones Decl. ¶ 16.

[140] Borders Decl. ¶ 5; Johnson Decl. ¶ 6 ("The beeping got under my skin because it was so loud and you can't change the volume . . . ."); Roberts Decl. ¶ 6 ("Everyone within a hundred feet would be able to hear it.").

[141] Borders Decl. ¶ 5.

[142] A. Carter Decl. ¶ 13 (embarrassed because her son asked whether she had paid her bill); Borders Decl. ¶¶ 5, 7 (the constant beeping was "humiliating"); Johnson Decl. ¶¶ 6-8 (was too embarrassed to drive in the car with anyone other than family "because the beeping could happen any time"); Best Decl. ¶ 4 (felt embarrassed and ashamed when the warning tones went off in front of coworkers and family); Roberts Decl. ¶ 7 (felt ashamed and humiliated when the alarm went off in the pick-up lane at her daughter's school).

[143] Swain Decl. ¶ 5.

hospital parking lot where she had taken her son to get emergency care.[144] The

erroneous alerts took a toll over time. One consumer, for instance, began suffering

from anxiety because she heard the alerts every other week for over two years.[145]

The Bureau estimates that consumers suffered, on average, $100 in harm for

each day of erroneous alerts.[146] USASF erroneously activated alerts 71,415 times,

for a total of 212,503 days, yielding approximately $21,250,300 in damages for

this group of consumers.[147]

Wrongful repossessions. Consumers whose cars were wrongfully

repossessed suffered significant harms, including many of the same harms from

USASF's wrongful disables but exacerbated because of how long consumers lost

---

[144] Roberts Decl. ¶ 6.

[145] Borders Decl. ¶ 5.

[146] *See, e.g., In re Come*, No. ADV. 07-1084-JMD, 2008 WL 2018280, at *3
(Bankr. D.N.H. May 8, 2008) (awarding $1,000 for emotional distress from
plaintiff having his children witness a wrongful repossession); *Allen v. JPMorgan
Chase Bank, N.A.*, No. 3:12-CV-164-P, 2012 WL 12865210, at *3 (N.D. Tex. July
6, 2012) (damages can include mental anguish and value of the time consumers
spent trying to correct loan servicer's errors); *Seaton v. Sky Realty Co.*, 491 F.2d
634, 636 (7th Cir. 1974) (after housing discrimination, upholding $500 in damages
for embarrassment and humiliation, which "can be inferred from the circumstances
as well as established by the testimony.").

[147] Kelly Decl. ¶¶ 14-21. For 20,416 instances, the warning tones lasted a total of
59,506 days. For 50,999 of the erroneous activations, USASF did not provide
information on how long they lasted, despite the Bureau's request. *See* González
Decl. ¶¶ 5-9. The Bureau conservatively estimates these alerts lasted three days
each, for a total of 152,997, because that was the median length from the 20,416
instances where the dates were known. Kelly Decl. ¶¶ 16-17.

their cars. According to USASF's records, the company's wrongful repossessions lasted from one to twelve days, unless USASF sold the car.[148]

For one, these consumers lost wages.[149] This inability to earn income sometimes led to severe, additional harms. One consumer, for instance, had a job that paid more than $4,000 a month—until USASF repossessed her car in error multiple times.[150] Because her job was over an hour away and paying $75 each way for a taxi was often too expensive, she lost her job, and after being out of work for months, could not afford her rent and was evicted.[151] Consumers also suffered significant out-of-pocket expenses, including for alternative transportation[152] and repairs from towing damage.[153] And as with USASF's other errors, consumers suffered significant emotional distress when their cars were erroneously

---

[148] Kelly Decl. ¶ 28 (USASF admitted to selling three of the wrongfully repossessed cars). In the additional 25 cases identified through consumer complaints, the Bureau does not know how long the wrongful repossessions lasted. *See* Schneider Decl. ¶ 10.

[149] Nettles Decl. ¶ 14 (lost her job); Smith Decl. ¶ 12 (would either come in late or would call out of work when she had no alternative means of getting there).

[150] Nettles Decl. ¶¶ 9-14.

[151] *Id*. ¶¶ 15-16.

[152] Keesee Decl. ¶ 8 (had to take a rideshare or walk to run her errands); Rodriguez Decl. ¶ 5 (paid $100 for Ubers to retrieve his erroneously repossessed vehicle from the tow truck company); Smith Decl. ¶ 12 (would pay $200 roundtrip to get to work).

[153] Nettles Decl. ¶¶ 11-12 (paid $80 for damage caused to her car by the towing company).

repossessed.[154] One consumer, for instance, felt "traumatized" after she lost her prospect of upward mobility at work due to USASF's mistakes,[155] while others felt frustrated, embarrassed, and angry over the situation that USASF put them in.[156]

The Bureau estimates that each wrongful repossession caused, on average, $5,000 in damages.[157] USASF wrongfully repossessed consumers' cars on at least 103 occasions, yielding approximately $515,000 in harm to this group of consumers.[158] After subtracting the approximately $6,200 in remediation that the company already provided to a few consumers, the Bureau seeks $508,800 for uncompensated harm from wrongful repossessions.[159]

---

[154] *See, e.g.,* Smith Decl. ¶ 12 (experienced "great emotional distress" after almost losing her job and having difficulty getting her children to school); Keesee Decl. ¶¶ 8-9 (having to take a rideshare service risked exposing her family to coronavirus and caused emotional distress and tension in the household).

[155] Nettles ¶¶ 14-17.

[156] Rodriguez Decl. ¶ 5 ("the whole experience was terrible and frustrating"); Swanson Decl. ¶ 7 (embarrassed because her colleagues and customers saw the wrongful repossession); Keesee ¶ 9 ("[t]he whole experience was a nightmare").

[157] *See, e.g., In re Bishop*, 296 B.R. 890, 894-898 (Bankr. S.D. Ga. 2003) (awarding over $6,300 in out-of-pocket costs and emotional distress resulting from bank's wrongful repossession of consumer's truck); *In re Lewis*, No. 18-31573, 2019 WL 2158832, at *9-10 (Bankr. W.D. La. May 16, 2019) (awarding over $6,000 for loss of property, out-of-pocket costs, and emotional distress resulting from wrongful repossession); *Washington v. City Title Loan, LLC*, No. CV 16-5427 FMO, 2018 WL 4005447, at *6 (C.D. Cal. Feb. 26, 2018) (awarding $10,000 in damages to plaintiff who was inconvenienced by a wrongful repossession).

[158] Kelly Decl. ¶¶ 26-29; Schneider Decl. ¶¶ 8-10.

[159] Kelly Decl. ¶ 29.

### 4. The Court should impose a civil money penalty of $10,000,000.

Considering the particular facts, circumstances, and posture of this case, the Court should award civil money penalties against USASF of $10,000,000.

The CFPA authorizes the imposition of a civil money penalty against any person that violates Federal consumer financial law.[160] Penalties are based on the number of days of each violation, and maximum penalties are broken into three tiers.[161] For violations that occurred after November 2, 2015, like here, tier one authorizes up to $6,813 for each day of a violation and requires no particular state of mind; tier two authorizes up to $34,065 per day and requires recklessness; and tier three authorizes up to $1,362,567 per day and requires a knowing violation.[162] When determining an appropriate penalty, courts must consider five statutory factors: the defendant's financial resources and good faith, the gravity of the violation or failure to pay, the risks or losses to consumers, the history of previous violations, and other matters as justice may require.[163]

USASF acted at least recklessly. "In general, a person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk attached to

---

[160] 12 U.S.C. § 5565(c)(1).
[161] 12 U.S.C. §§ 5565(c)(2)-(3)
[162] 12 U.S.C. §§ 5565(c)(2)(A)-(C); 12 C.F.R. §§ 1083.1(a)-(b) (adjusting for inflation).
[163] 12 U.S.C. § 5565(c)(3).

his conduct, in gross deviation from accepted standards."[164] Here, the company knew it was routinely repossessing and disabling cars in error. The company "frequently heard from consumers" that it had improperly repossessed or disabled cars,[165] and received "between 30-40 calls *per day* from customers whose car was beeping or disabled even though they had made their payments."[166] Yet the unlawful conduct continued for years because the company chose not to fix the causes of its errors. Management was aware, for example, that its SIDs activated in error because the devices were "faulty and antiquated," but the company chose not to replace them because it "would be too expensive."[167] And despite awareness that it was mistakenly repossessing cars because of the company's long delays in processing payments, the illegal repossessions continued for years.[168]

Defendants violated the law approximately 130,000 times,[169] each of which could carry its own penalty.[170] Calculating the penalty per violation would

---

[164] *CashCall*, 35 F.4th at 748.

[165] Jones Decl. ¶ 7.

[166] *Id.* ¶ 12 (emphasis added).

[167] *Id.* ¶ 14.

[168] *Id.* ¶ 10.

[169] *See* Compl. ¶¶ 14, 28, 33, 40, 49 (describing the number of instances of violations, which totals approximately 130,000).

[170] *See, e.g., Integrity Advance*, No. 2015-CFPB-0029, at *38 (Jan. 11, 2021) (Decision of Dir.) (noting that each of the 82,980 unlawful loans could carry its own penalty); *CFPB v. Siringoringo*, No. SACV 14–01155 JVS, 2016 WL 102435, at *7 (C.D. Cal. Jan. 7, 2016) (awarding penalty "based on an estimate of

authorize a penalty in the billions.[171] USASF's violations occurred from at least December 24, 2015 to October 6, 2021—a minimum of 2,113 days.[172] Thus, even calculating penalties on only a per-day basis for purposes of this case, and considering only one violation per day, authorizes a civil money penalty of up to $71,979,345.[173]

Most of the statutory factors—the violation's gravity, consumer losses, history of violations, and other matters as justice may require—support a large penalty. The company harmed thousands of consumers for years. The harm was

---

2,400 customers paying advanced fees and being denied loan modifications"); *CFPB v. Morgan Drexen, Inc.,* No. SACV 13-1267-JLS, 2016 WL 6601650, at *3 (C.D. Cal. March 16, 2016) (noting number of consumers harmed in determining reasonableness of penalty).

[171] A penalty of $34,065 per instance, across the approximate 130,000 instances, would result in $4.4 billion in penalties.

[172] *See* Compl. ¶ 40 (double billing of CPI occurred at least from December 2015 through August 2021); *id.* ¶ 11 (erroneous SID activation occurred since 2016); *id.* ¶ 49 (misapplication of payments occurred at least from November 1, 2016 to August 31, 2021). *See* Kelly Decl. ¶ 7 (double billed for CPI at least from December 24, 2015 to August 2, 2021); *id.* ¶ 23 (erroneously activated SIDs at least from November 5, 2016 to August 28, 2021); *id.* ¶ 31 (repossessed cars in error at least from December 29, 2016 to August 16, 2021); *id.* ¶ 53 (failed to return GAP from March 9, 2017 to October 6, 2021). For purposes of calculating a maximum penalty, the Bureau is conservatively using an end date based on the data USASF provided during the Bureau's investigation, even though the company's violations continued beyond this date. *See, e.g.*, Jones Decl. ¶¶ 4, 8 (the company repossessed cars in error during his employment from February 2020 to February 2022); Schneider Decl. ¶ 18 (USASF wrongfully repossessed consumers' cars as late as May 19, 2023).

[173] $34,065 per day x 2,113 days.

substantial: consumers lost millions of dollars, lost jobs, their children missed school, they were stranded away from home, and they suffered great distress.

Only USASF's financial resources justify any mitigation. When filing for bankruptcy, the company estimated its assets as between $100,001 and $500,000.[174] But "courts considering a defendant's ability to pay a civil penalty look beyond the funds and assets currently in the defendant's possession."[175] USASF earned significant revenue from its unlawful conduct. It collected almost $6 million in unearned GAP premiums, sold cars that were wrongfully repossessed, and collected money from consumers who overpaid to avoid wrongful SID activations and repossessions, among others.[176] In short, its long-standing and reckless violations of consumer protection law demand a significant penalty. Thus, given the facts and circumstances of this matter, a mitigated penalty of $10,000,000 is warranted.[177] If the company cannot pay the penalty because of other liabilities, its imposition—or the imposition of even a nominal penalty of $1—is still warranted because it will allow the Bureau to provide redress to

---

[174] *In re USASF Servicing, LLC*, No. 23-11256-TMH, ECF No. 1, at *3 (Bankr. D. Del. Aug. 25, 2023).
[175] *United States v. Daniel Chapter One*, 89 F. Supp. 3d 132, 154 (D.D.C. 2015). *See also S.E.C. v. Narvett*, No. 13-C-927, 2014 WL 5148394, at *4 (E.D. Wis. Oct. 14, 2014) (financial difficulties "not a strong reason to reduce the civil penalty" given, in part, "the substantial amounts of money [the defendant] obtained").
[176] *See* nn. 59, 61, 64-67, 148, *supra*.
[177] *See* 12 C.F.R. §§ 1075.103, 1075.104.

USASF's victims from the Bureau's civil penalty fund, if the redress is uncollectible from USASF.

## III.    CONCLUSION

For the reasons set forth above, the Bureau respectfully requests that the Court grant the proposed relief.

Dated:        January 3, 2024            Respectfully Submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau:

ERIC HALPERIN
Enforcement Director

RICHA S. DASGUPTA
Deputy Enforcement Director

MICHAEL POSNER
Assistant Deputy Enforcement Director

**Elena González**
New York Bar No. 430526
Telephone: 202-435-9103
Email: elena.gonzalez@cfpb.gov

**Joseph Sanders**
New York Bar No. 4397204
Illinois Bar No. 6308241
Telephone: 202-435-9642
Email: joseph.sanders@cfpb.gov

**Lindsey M. Siegel**

Georgia Bar No. 730072
Telephone: 202-407-0498
Email: lindsey.siegel@cfpb.gov

*Address for all Attorneys for Plaintiff*:
1700 G Street, NW
Washington, DC 20552

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this Brief has been prepared in Times

New Roman (14 point) font, as approved by the Court in LR 5.1(B).

**Elena González**
New York Bar No. 430526
Attorney for Plaintiff

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: 202-435-9103
Email: elena.gonzalez@cfpb.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 3, 2024, Plaintiff's Motion for Default

Judgment Against Defendant was mailed by United States Postal Service to the

Defendant:

> USASF Servicing, LLC
> CT Corporation System, Registered Agent
> 289 S Culver St
> Lawrenceville, GA 30046

> **<u>Elena González</u>**
> New York Bar No. 430526
> Attorney for Plaintiff

> Consumer Financial Protection Bureau
> 1700 G Street, NW
> Washington, DC 20552
> Telephone: 202-435-9103
> Email: elena.gonzalez@cfpb.gov