Attachment B

Declaration of Nicole Kelly

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>USASF Servicing, LLC,<br><br>　　　　　　　Defendant. | Civil Action Number: 1:23-cv-03433-VMC<br><br>**DECLARATION OF NICOLE KELLY IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |

I, Nicole Kelly, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a United States citizen over 18 years of age. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to them.

2. I am an employee of the Consumer Financial Protection Bureau ("Bureau"). I have been an employee of the Bureau since July 1, 2012. Since 2021, I have been a Senior Data Scientist. My current duties include conducting financial and data analysis for the Bureau. I have a bachelor's degree in Applied Economics and Management from Cornell University.

1

3. I was assigned to work on the Bureau's investigation of and litigation against USASF Servicing, LLC ("Defendant" or "USASF").

4. I have reviewed the written reports Defendant produced in response to the Bureau's Civil Investigative Demand ("CID") dated September 16, 2021.

## Double Billing

5. Bureau counsel in this matter asked me to identify in Written Report 2 the earliest and latest date USASF identified that it double billed a consumer.

6. USASF produced Written Report 2 in response to Written Report Request 2 in the Bureau's CID, dated September 16, 2021, which asked USASF to produce a report that lists all consumers who were subject to a double-billing error between November 1, 2016 and August 31, 2021.

7. According to my review of Written Report 2, the earliest date Defendant identified a double-billing error was December 24, 2015 and the latest date is August 2, 2021. These are the earliest and latest dates that appear in the field: "Date_of_Billing_Error."

## Erroneously Activated Starter Interruption Devices

8. Bureau counsel in this matter asked me to identify in Written Report 3 the number of times USASF identified that it erroneously activated a starter interruption device ("SID") and to calculate the harm to consumers. Specifically, they asked me to calculate the number of times USASF indicated that it

erroneously disabled consumers' vehicles using a SID ("SID disable") and the number of times USASF indicated that it imposed erroneous SID warning beeps ("SID warning"). Bureau counsel also asked me to calculate the total number of days for which the warning beeps persisted.

9. USASF produced Written Report 3 in response to Written Report Request 3 in the Bureau's CID, dated September 16, 2021, which asked USASF to provide "a report that lists all consumers who were subject to a SID Application" between November 1, 2016 and August 31, 2021.

## SID Disables

10. According to my review of Written Report 3, Defendant identified 7,523 erroneous SID disables. For each of these instances, Defendant indicated "Vehicle Disable" or "Vehicle Disabled" in the field: "Type_of_SID_Application" and "SID Error" in the field: "Reason_for_SID_Application." USASF's report also provided an explanation in the field: "Cause_of_SID_Error," such as "programming error."

11. For sixteen of the erroneous disables, dollar amounts ranging from $20 to $221.55 appear in the "Amount_Of_Remediation" field in Written Report 3, totaling $1,233.83. For the other 7,507 erroneous disables, there is no dollar amount in the "Amount_Of_Remediation" field.

12. Bureau counsel asked me to calculate the total amount of harm Defendant caused due to its erroneous disabling of consumers' vehicles. At the request of Bureau counsel, I used $500 as the amount of harm to each consumer for an erroneous SID disable.

13. To calculate the total amount of harm from erroneous SID disables, I multiplied the 7,523 erroneous SID disables by $500, totaling $3,761,500. To calculate the total amount of un-remediated harm, I then subtracted the remediation previously provided by Defendant, $1,233.83, totaling $3,760,266.17.

## SID Warnings

14. Written Report 3 also indicates that Defendant erroneously imposed a SID warning 71,415 times. This represents every instance in the Warning Tone tables where Defendant indicated an error in the field: "Cause_of_SID_Error."

15. All 71,415 instances of erroneous SID warnings in Written Report 3 contained a date in a field named "Date_of_SID_Application" provided in response to the Bureau's request, in subpart (g), for the "Date of SID Application (for warnings that lasted more than one day, provide each date the warning persisted)."

16. However, only 20,416 instances contained a valid[1] date in a field named "Warning_Tone_Removal_Date." For these 20,416 instances, I calculated the total number of days the warning tones persisted by calculating the number of days between the "Warning_Tone_Removal_Date" and the "Date_of_SID_Application" inclusive of the start and end date. The total number of days these warning tones persisted is 59,506. Bureau counsel asked me to calculate the median length of time these warning tones persisted, which was 3 days, inclusive of the start and end date.

17. Written Report 3 contains 50,999 instances where there is not enough information to calculate the length of time each erroneous SID warning persisted because the "Warning_Tone_Removal_Date" field is blank or inconsistent.[2] Bureau counsel asked me to use 3 days for the length of time each erroneous SID warning persisted for these unknown instances because that was the median number of days in known instances (Paragraph 16, above). Using a length of three days for these 50,999 instances yields a total of 152,997 days of warning tones.

---

[1] There is one instance with a Warning_Tone_Removal_Date that occurs 3 months prior to the Date_of_SID_Application, which I assume is a data error, and include this instance instead in the calculation for instances where there is not enough information to calculate the length of time the erroneous SID warning persisted.
[2] For the instance where the Warning_Tone_Removal_Date is 3 months before the Date_of_SID_Application, I assume this was an error and applied the 3-day proxy length here as well.

18. I calculated the total number of days that erroneous SID warnings persisted by summing the 59,506 days from Paragraph 16 and the 152,997 days from Paragraph 17, which equals 212,503 days.

19. For the erroneous warning tones, there were no dollar amounts in the "Amount_Of_Remediation" field in Written Report 3. The entries were all blank.

20. Bureau counsel asked me to calculate the total amount of harm caused by SID Warnings. At the request of Bureau counsel, I used $100 as the amount of harm to a consumer for each day an erroneous warning tone occurred.

21. To calculate the total amount of harm from erroneous SID warnings, I multiplied the 212,503 days that erroneous SID warning tones persisted by $100 per day, totaling $21,250,300.

22. Bureau counsel in this matter also asked me to identify in Written Report 3 the earliest and latest date USASF identified that it erroneously activated a SID.

23. According to my review of Written Report 3, the earliest date Defendant identified that it erroneously activated a SID was November 5, 2016 and the latest date is August 28, 2021. These are the earliest and latest dates that appear in the field: "Date_of_SID_Application" for those instances of erroneously activating a SID.

**Repossession Errors**

24. Bureau counsel in this matter asked me to identify in Written Report 5 the number of times USASF identified that it had repossessed a vehicle in error and to calculate the total harm to those consumers.

25. Defendant produced Written Report 5 in response to Written Report Request 5 in the Bureau's CID dated September 16, 2021, that asked Defendant to provide "a report that lists all consumers who were subject to repossession" between November 1, 2016 and August 31, 2021.

26. According to my review of Written Report 5, USASF identified 78 instances in which it erroneously repossessed consumers' vehicles. For these 78 instances, "Repossession Error" appears in the field: "Cause_for_Reposession," and there is an explanation for the nature of the error in the field marked "Type_of_Repo_Error," such as "customer made a payment to stop the repossession and the repossession assignment was not closed."

27. For twenty of the erroneous repossessions, dollar amounts ranging from $50 to $555 appear in the "Amount_Of_Remediation" field in Written Report 5, totaling $6,199.52. For the other 58 erroneous repossessions, there is no dollar amount in the "Amount_Of_Remediation" field.

28. For the 78 erroneous repossessions identified in Written Report 5, I calculated the time Defendant took to return the vehicle by calculating the

difference between the "Date_Vehicle_Returned" field and "Date_of _Repossession" field. The time to return the vehicle ranged from same day to 12 days, unless Defendant sold the vehicle. (The report shows that USASF sold 3 of the cars it erroneously repossessed.)

29. Bureau counsel asked me to calculate the total amount of harm Defendant caused by wrongfully repossessing consumers' vehicles. At the request of Bureau counsel, I used a flat amount of $5,000 of harm for each wrongful repossession. I also included the 25 additional repossessions identified by Bureau investigator Dani Schneider through consumer complaints. *See* Schneider Decl. ¶¶ 8-10. To calculate the total amount of harm, I multiplied 103 wrongful repossessions (78 from Written Report 5 and 25 from consumer complaints) by $5,000, which equals $515,000. To calculate the total amount of un-remediated harm, I then subtracted the remediation previously provided by Defendant, $6,199.52, totaling $508,800.48.

30. Bureau counsel in this matter also asked me to identify in Written Report 5 the earliest and latest date USASF identified that it erroneously repossessed a vehicle.

31. According to my review of Written Report 5, the earliest date Defendant identified that it erroneously repossessed a vehicle was December 29,

8

2016 and the latest date is August 16, 2021. These are the earliest and latest dates that appear in the field: "Date_of_Repossession."

## Unearned GAP Premiums

32.  Bureau counsel asked me to analyze Written Report 6 and calculate the amount of unearned GAP premiums that Defendant did not refund to consumers. Specifically, Bureau counsel asked me to calculate refunds due to consumers whose loans were charged-off or paid off prior to the end of the loan term.

33.  Defendant produced Written Report 6 in response to Written Report Request 6 in the Bureau's CID, dated September 16, 2021, asking Defendant to provide "a report that lists all consumers who had an Ancillary Product attached to their loan within one month of when the loan was satisfied or charged-off" between November 1, 2016 and August 31, 2021.

34.  Written Report 6 contains 32,738 loans that have the value "GAP" in the field: "Ancillary_Product." For these instances, Defendant reported 21,430 as charged-off (in the field "Closure_Type") and 11,308 as "satisfied" (that is, paid off prior to the end of the loan term). *See* Attachment B-1.

35.  Of those 32,738 loans, Defendant did not list a GAP refund amount (in the field "GAP_Refund_Amount") for 2,875 of the 21,430 loans that were charged-off and 5,689 of the 11,308 loans that were paid off early.

9

36. For the loans described in Paragraph 35, I calculated the unearned GAP premium as follows:

(i) First, I calculated the total cost of GAP that the consumer paid (for satisfied loans) or still owes (for charged-off loans), which is the upfront cost of the GAP product plus the interest charged by Defendant. I refer to this as the *Total Cost of GAP*.

(ii) Second, I calculated the portion of that amount that the consumer paid in monthly payments before charge-off or early payoff. I refer to this as the *Earned Premium* because it is the amount the consumer paid before the GAP product became void at charge-off or early payoff.

(iii) Third, I subtracted the *Earned Premium* from the *Total Cost of GAP*. This difference is the unearned GAP premium because it is the portion of the total cost of GAP that the consumer paid or still owes for the GAP after it became void.

37. To calculate the *Total Cost of GAP* (referred to in Paragraph 36(i) above), I multiplied the upfront cost of the GAP product, found in the "GAP_Amount" field in Written Report 6, by the interest the consumer was charged to finance that amount (estimated, as explained in paragraph 38 below) for

the term of the loan (estimated, as explained in paragraph 39 below)[3]:

$$\text{Total Cost of GAP} = \text{GAP Amount} * 59 * \frac{0.1843}{12} * \frac{\left(1 + \frac{0.1843}{12}\right)^{59}}{\left(1 + \frac{0.1843}{12}\right)^{59} - 1}$$

38. Due to missing information in Defendant's response to the Bureau's requests for amount of interest charged on the GAP product, I used an interest rate of 18.43%. I chose this rate as a conservative estimate because consumer Retail Installment Contracts of USASF customers that I reviewed included a 20% APR and the APR listed in a May 2023 report for USASF Asset Backed Securities pools reported a range of 18.33% to 18.53% APR across nearly 40,000 loans originated prior to August 11, 2021, and the weighted average of these rates weighting by the original balance amount was 18.43%.

39. Due to missing information in Defendant's responses to the Bureau's requests regarding the term of the loan, I estimated the term at 59 months. I chose this term as a conservative estimate because consumer Retail Installment Contracts of USASF customers that I reviewed included a 65-month term and the term listed in the aforementioned May 2023 report for USASF Asset Backed Securities pools

---

[3] As validated against the Federal Reserve Bank of Dallas' Payment Calculator for Mortgages, Car Loans and Other Term Loans
https://www.dallasfed.org/educate/calculators/closed-calc

reported a range of 58 to 59 months for the term of the loans originated prior to August 11, 2021 and the weighted average of these terms weighting by the original balance amount was 58.5 which rounds to 59 months.

40. To calculate the *Earned Premium* (referred to in paragraph 36(ii) above) I first calculated the number of months that a consumer paid for GAP prior to charge-off or early payoff. I did so by determining the number of months that occurred between the date the consumer purchased GAP, found in the "Date_Purchased" field, and the date the consumer's loan was charged-off or paid off, located in the "Satisfaction_or_Charge_Off_Date" field, which I then refer to as *Months Paid*. If the day of the month of the satisfaction or charge off date was before the day of the month of purchase, I removed that month because the consumer did not have the product for that full month.[4]

41. I then calculated the amount a consumer paid towards GAP per month by dividing the *Total Cost of GAP* by the term, 59 months (*GAP Paid Monthly*).

42. I then calculated the *Earned Premium* by multiplying the *GAP Paid Monthly* amount by the *Months Paid*.

43. After completing the steps described in paragraphs 36-42, I

---

[4] E.g. If a consumer purchased GAP on 1/10/21 and charged off on 3/9/21, that is considered 1 month paid, rather than 2. However, in the same situation if the consumer had charged off on 3/10/21, they would have 2 months paid.

determined that the total amount of unearned GAP premiums owed to the 2,875 instances where consumers had loans that were charged off and did not receive any refund is $1,403,949.

44. I also determined that the total amount of unearned GAP premiums owed to the 5,689 instances where consumers had loans that were satisfied and did not receive any refund is $3,144,100.

45. Bureau counsel also asked me to calculate the unearned GAP premiums for consumers who paid off early and did receive at least a partial refund to identify whether any consumers were under-refunded. To calculate the unearned GAP premium for these consumers, I used the same methodology described in Paragraphs 36-42 above.

46. I then compared the unearned GAP premiums for those instances to the amount Defendant refunded them, found in the "GAP_Refund_Amount" field, and determined which ones were under-refunded and by how much.

47. There were 5,101 instances where consumers paid off their loans early and were under-refunded their unearned GAP premiums totaling $1,285,917.

48. In sum, I calculated that Defendant did not refund, and thus consumers are due, $5,833,966 of unearned GAP premiums ($1,403,949 for consumers whose loans were charged off, $3,144,100 for consumers whose loans were paid off early and did not receive any refund, and $1,285,917 for consumers

13

whose loans were paid off early and received at least a partial refund). *See* Attachment B-1.

49. Bureau counsel further asked me to calculate the amount of prejudgment interest that would apply to the refunds owed to consumers due to Defendants' failure to refund unearned GAP premiums.

50. In order to do this, I performed interest calculations using the interest rate from SEC Rule 17 C.F.R. § 201.600, Interest on sums disgorged. That rule states that prejudgment interest "shall be computed at the underpayment rate of interest established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. 6621(a)(2), and shall be compounded quarterly." That underpayment rate is an annual rate that can be updated on a quarterly basis.

51. I used the Unrefunded Unearned GAP premium identified by loan in my earlier calculations as the principal. To calculate what the term of the interest should be, I calculated the number of days between the Satisfaction_or_Charge_Off_Date and December 1, 2023 and then divided that number by 365 to get the number of years the loan was unrefunded. For the rate of the interest, I determined what quarter the Satisfaction_or_Charge_Off_Date occurred during, and then assigned the corresponding interest rate from the Internal Revenue Service's 2023-17 Revenue Ruling Document, which contains the "TABLE OF INTEREST RATES FROM JANUARY 1, 1999 - PRESENT

14

NONCORPORATE OVERPAYMENTS AND UNDERPAYMENTS." I then applied the following formula, where $r$ is the rate from the underpayment table,[5] and $t$ is the term in years. The statute requires interest to be compounded quarterly (four times per year), so I divided the rate by 4 and multiplied the term by 4.

$$Prejudgment\ Interest = Unrefunded\ Unearned\ GAP\ Premium * \left(1 + \frac{r}{4}\right)^{t*4} - Unrefunded\ Unearned\ GAP\ Premium$$

52.  I then summed the interest for the 13,665 loans (comprising the charged-off unrefunded loans, the paid off under-refunded loans, and the paid off unrefunded loans), which totals $1,274,357. *See* Attachment B-2 (illustration of one prejudgment interest calculation).

53.  USASF's failures to return some portion of GAP premiums lasted from March 9, 2017 to October 6, 2021.

54.  In accordance with privacy policies of the Court and the Bureau, Plaintiff's Attachments have been redacted to protect personally identifiable information.

---

[5] This assigned rate was kept constant for a given loan throughout the term of the prejudgment interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2023

                                                 */s/ Nicole Kelly*
                                 Digitally signed by NICOLE KELLY
                                 Date: 2023.12.22 15:25:44 -05'00'

**<u>Nicole Kelly</u>**
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
*Senior Data Scientist*