Attachment C

Declaration of Timothy Jones

Declaration of Timothy Jones

Pursuant to 28 U.S.C. § 1746

I, Timothy Jones, hereby declare and state as follows:

1. I am a U.S. Citizen over the age of eighteen and reside in Lawrenceville, Georgia.

2. I have personal knowledge of the following facts, to which I could and would testify to if I were called to testify as a witness.

3. On or about February 2020, I was hired by U.S. Auto as Collections Manager. I cannot recall the relationship between U.S. Auto and USASF. My job duties were to oversee the collection function, manage and oversee six Collection Supervisors, create and improve policies and procedures, and manage the domestic and overseas collection teams. I reported to PJ Gobin (Director of Accounts), Colin Bachinsky (Chief Executive Officer), and Brooks Stewart (Chief Credit Officer). I had morning meetings with my supervisors every day from 7:30-8:00am, where we discussed company strategy, the direction of the company, and shared high level and detailed information.

4. I worked at U.S. Auto (the Company) from approximately February 2020 until February 2022. During my employment at the Company, there were approximately 45-50 collectors in Georgia and approximately 25-30 on the overseas team in Barbados. Each of the six Collection Supervisors that I oversaw had between 7-10 personnel. There were different customer service teams that handled customers based on the lateness of their payments. The Barbados team handled customers who were 1-10 days past due. There were three teams that handled front end collections, known as the Collection Complaint Team, which handled customers who were around 10-20 days past due. There was also a customer service team for customers who were around 21-30 days past due, one for customers around 30-45 days past due, and one for customers around 45-50 days past due. The team that handled 45-50 days past due also handled repossessions, which happened around day 60. The Collection Complaint Team handled the majority of complaints because most customers calling the Company were between 10-15 days past due, but all collectors at the Company were trained to handle customer service calls. Our collections team handled between 3,000-4,000 accounts every day. Most of the volume from customers came over phone dialer.

1

5. The phone system that was used by the Company was out of date, and many customers waited on hold for at least 30 minutes. Many customers would get disconnected when they were next in the phone queue. One of our key performance indicators (KPIs) that came up in my morning supervisor meetings was to reduce hold times for customers, but replacing the phone system was deemed too expensive. Our company goal was a three-minute hold time, which was never achieved during my time at the Company.

6. When a customer called the Company with an ongoing complaint or asked to speak to a supervisor, then the Collections Supervisor would take the call. If the call was escalated, meaning it was a complaint that the supervisor could not handle or the customer was asking for a threshold of money that went above the supervisor's approval level, then the call would be escalated to me. Each week, I handled between 20-30 customers who had been escalated based on their complaints. I also frequently covered for my Collection Supervisors when they were out of the office.

7. I frequently heard from consumers that the Company had improperly repossessed their car, failed to credit payments, improperly disabled their car, or sold them cars that did not work even after putting thousands of dollars into fixing them.

8. Each week, the Company repossessed between 250-400 cars. Of those weekly repossessions, approximately 5-8 of them should not have happened. Over the two years I worked at the Company, I reviewed the case files of hundreds of consumers whose cars were repossessed improperly. An improper repossession had several explanations, including because the customer's payment was caught up in the lock box or with the payments team, the consumer's car exchange hadn't been properly re-contracted into the Company computer system, or a collector had made an error. Brooks and PJ were aware of the volume of the Company's wrongful repossessions and created a policy to terminate collectors who made an egregious mistake that resulted in a wrongful repossession. This policy was prompted by a collector who put the wrong social security number down for a customer which resulted in a wrongful repossession.

9. Depending on the severity of the collector's mistake, some wrongful repossessions prompted a compliance meeting. Once or twice a month, a compliance meeting would take place at

the Company to walk a collection agent through their mistake as a learning opportunity. I attended these compliance meetings, as did the collection agent who made the error, their Collection Supervisor, Christian Brown (Sr. Manager, Compliance), PJ, Brooks, and two or three other collection agents for learning purposes. We would strip down the account to see where the error took place and fix the error. Every compliance meeting was reported to Christian Brown's supervisor, who worked on the legal team.

10. The majority of the time, the Company had improperly repossessed the vehicle because the customer had sent a check to the lock box. Customers had no way to know that mailing a check to the Company's PO Box was not the most effective method of payment. Sometimes checks that were received by the Company took weeks to be processed. During the two years I worked at the Company, over a hundred customers had their cars wrongfully repossessed because of the slowness of our payment processing.

11. In addition to a compliance meeting, it was the Company policy for either the collection agent or Collection Supervisor to call a customer to apologize for the wrongful repossession, admit to our error, and then credit their account with one payment. Most customer accounts at the Company are biweekly and collections agents had the authority to apply a credit of one biweekly payment towards their account after a wrongful repossession. If the customer wasn't happy or asked to speak to a supervisor, then a Collections Supervisor would handle the complaint. Sometimes a Collections Supervisor would escalate the customer complaint to me. I spoke to numerous customers who would not accept a credit of their biweekly payment because it was not enough, and told me that they had lost work, couldn't take their kids to school, felt embarrassed, and they wanted more reimbursement for their time and energy. I would review their account and if it was a wrongful termination, I was authorized to give a customer a double repayment, meaning two of their biweekly payments were credited to their account. If a customer wanted more than two biweekly payments, I would escalate the consumer complaint to PJ. I remember a handful of times when I escalated a customer to PJ and he either approved a higher credit amount or sent me the approval to provide a customer with an additional credit.

12. Starter interrupter devices (SIDs) were installed in the Company vehicles and were supposed to beep if the customer was past due and then disable the vehicle if the customer continued to be late. Customers were supposed to be able to call the Company for a code to re-engage their vehicle, which would give them 24 hours to make their payment. I often heard customers complain that their car was beeping and they didn't know why because they had made their payment on time. The Company received between 30-40 calls per day from customers whose car was beeping or disabled even though they had made their payments. I can recall numerous customers telling me that they were stuck at Walmart or couldn't pick up their kids because their car was improperly disabled. Customers were understandably upset that their car was disabled or beeping even though their payments were on time.

13. Most of the customers who called about their disabled vehicles were up to date on their payments and the SID should not have disabled their vehicle. Sometimes the problem was that customers' payments had been processed late by the Company because there were, for example, significant delays in payment processing for payments that came mailed to our lock box. In some cases, the SID wasn't properly syncing with our payment systems. Customers would make their payments either online, over the phone with a debit card, or would mail their payment to the Company's lock box. The payment system that the Company used did not properly line up with the SID, so the car was disengaged by the SID even though payments were on time in our system.

14. In addition to delays with payment processing and problems with payment syncing, SIDs were also erroneously activated because the SID was malfunctioning. In 2021, I attended approximately four meetings over Zoom with representatives of the Company's SID vendor. Colin, PJ, Brooks and I attended these meetings, as did the SID vendor's administrator and a director-level representative for the SID vendor. During those meetings, and in conversations I had with my Company managers subsequently, I understood that the SIDs were faulty and antiquated. Consequently, the SIDs would beep erroneously or prematurely. During one meeting, I told Colin that swapping out the device would be a win for the customer because the erroneous beeps and disables would stop, and that it would also be a win for our customer service team who wouldn't

4

need to handle all of those complaint calls anymore. But Colin stated that he did not want to replace the SID in every vehicle with a U.S. Auto loan because that would be too expensive.

15. Because of the erroneous beeping, some customers made early payments on their accounts to stop the beeping, even though they were up to date on their payments. Brooks told me not to refund customers for their early payments because we are in the business of collecting money, not returning it. I told Brooks that customers are not past due. He told me that some of the customers will eventually be past due, so the Company should keep the extra payment on their account as a credit. Customers were not notified that there was a credit on their account when they made an extra payment.

16. When a customer called in to complain that their car was erroneously beeping or had been wrongfully disabled, our customer service teams were trained to apologize, provide them with a code to reengage their vehicle, and tell them to have a nice day. It was common for customers to call back for a second time the same day because the SID was so antiquated that the first code didn't always reengage their vehicle or the SID didn't reengage their vehicle because it simply wasn't working.

17. Sometimes customers wanted something for the inconvenience of not getting to work or being unable to drive to daycare drop off due to an erroneous disable. There was no company policy to reimburse customers who were harmed by the erroneous beeping or disabling of their vehicle. I can recall approximately three instances when a customer complained excessively, and collection agents offered a customer a one-time gift card of $25 or less. There was no company policy to refund customers who overpaid their accounts because of the erroneous beeping or disabling of their vehicle.

18. During my employment at the Company, I trained my collections teams to diffuse conversations with customers who were irate or pissed-off because their cars weren't working. It was a running joke among the collectors that a customer might come and blow up our offices. The Company held active shooter trainings and the collectors were trained on how to deal with threats from customers over the phone. Numerous customers threatened to harm collectors, and I can think of ten examples when I involved the police, and in approximately four of those instances I

filed a formal police report. In one instance, a customer stated that he was going to come to the offices and he threatened my collector's life. The compliance team reviewed the recording and escalated the call to me and the General Counsel, but the attorney did not want to be involved. Brooks asked me to handle it and PJ told me to let it go because it wasn't that serious. I wanted my team to feel safe, so I filed a police report and gave the recording to the police.

19. I understood why customers were upset. They were in a revolving horror story of putting money into cars that were being turned off or repossessed when they should not have been, or having mechanical problems. The cars that the Company sold its customers were in terrible shape. And the SIDs were antiquated and were disabling cars and causing beeping for no discernable reason. I wanted to try and change things and realized I needed to change my environment. I wasn't proud of our product and I decided I could no longer work for the Company. I was working 70 hour weeks and carried a lot of guilt for working at a company that was targeting low income people unfairly. In around February 2022, I told PJ and Colin that I didn't like the direction of the business and I gave my two weeks' notice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __11__ __5__, 2023.

Timothy Jones