## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CONSUMER FINANCIAL
PROTECTION BUREAU,

     Plaintiff,

v.

USASF SERVICING, LLC,

     Defendant.

Civil Action No.
1:23-cv-03433-VMC

### OPINION AND ORDER

Before the Court is the Motion of Plaintiff Consumer Financial Protection Bureau (the "Bureau") for Default Judgment ("Motion," Doc. 12). The Clerk entered default against defendant USASF Servicing, LLC ("USASF") on October 10, 2023. No timely response was filed to the Motion. For the reasons that follow, the Court will grant the Motion as to liability only and injunctive relief, and will direct supplementation as to damages.[1]

### Background

### I.    Challenged Business Practices

---

[1] Don A. Beskrone, Chapter 7 Trustee of USAF Servicing, LLC filed a response to the Bureau's Motion for Clerk's Entry of Default after the Clerk entered default. (Doc. 8). The Court discusses this response in Section II.B. below.

USASF is the servicer of car loans originated by its affiliate U.S. Auto Sales, Inc., a buy-here, pay-here car dealer with dealerships throughout the Southeast United States. (Compl. ¶ 2). USASF's principal place of business is at 540 U.S. Auto Sales Blvd., Lawrenceville, Georgia 30046. (*Id.* ¶ 8). USASF services automobile loans that are used by consumers for personal, family, or household purposes. (*Id.* ¶ 9).

### A.    Starter Interruption Devices

Since at least March 2016, starter-interruption devices (SID) were installed in the vehicles whose loans USASF serviced, with the exception of vehicles sold in November 2016. (*Id.* ¶ 11).

A starter-interruption device (SID) is a device that an auto-loan servicer can activate to sound warning tones or disable the car altogether. (*Id.* ¶ 10).

When USASF activated the warning tones, every time the consumer turned their vehicle on or off, a ten-second series of beeps would occur. (*Id.* ¶ 12). According to USASF, a consumer is delinquent and in default the moment the consumer misses one payment. (*Id.* ¶ 13). According to USASF's internal procedures, USASF would activate warning tones for the first four days following a missed payment and would disable the vehicle once the consumer was five days past due, but would not activate the SID if the consumer had made a promise to pay their loan. (*Id.*).

Since 2016, USASF activated SIDs in consumers' vehicles tens of thousands of times in violation of its own policy, including at least 7,500 erroneous disables and over 71,000 erroneous warnings. (*Id.* ¶ 14). USASF admitted to the Bureau that, due to programming errors, system miscommunication, and human error, USASF erroneously disabled vehicles at least 7,500 times. (*Id.* ¶ 15). Of the erroneous disables, at least 5,200 occurred when the consumer was not in default or had made a promise to pay. (*Id.* ¶ 16). USASF wrongfully disabled vehicles at least another 1,500 times after it had explicitly promised the consumers that it would not. (*Id.*). USASF also admitted to the Bureau that, due to programming errors, system errors, and human error, USASF erroneously sent warning tones over 71,000 times to consumers who had made a payment or were not in default. (*Id.* ¶ 17). The erroneous warning tones persisted for four days for many consumers, and they lasted more than four days in hundreds of instances. (*Id.* ¶ 18).

**B.    Guaranteed Asset Protection Premiums**

U.S. Auto Sales, Inc., an affiliate of USASF, sold Guaranteed Asset Protection ("GAP") to consumers from February 2017 until October 2022. (*Id.* ¶ 23). From February 2017 through August 2021, around 64,000 consumers purchased GAP from U.S. Auto Sales, Inc. (*Id.*).

GAP is an add-on product that covers some of the deficiency balance if a car is totaled and the consumer still owes money on their car loan after the application of auto-insurance proceeds. (*Id.* ¶ 22). When GAP was sold to consumers, its cost was added to the loan used to purchase the car, and the loan was then serviced by USASF. (*Id.* ¶ 24). Although U.S. Auto Sales, Inc. sold the GAP and USASF serviced the loan that paid for it, the GAP product was administered by unaffiliated companies. (*Id.*).

USASF repossessed cars from consumers before the end of their loan term in certain circumstances, for example if the consumer stopped making payments on their loan. (*Id.* ¶ 25). USASF would then "charge off" the accounts of some of these consumers, meaning USASF wrote off the account as a loss. (*Id.*). Consumers whose loans were charged off were still legally obligated to pay any outstanding loan amount. (*Id.*).

GAP coverage becomes void and worthless to the consumer when USASF repossesses a car and charges off the loan because the consumer no longer has the car. (*Id.* ¶ 26). Because the consumer paid for GAP based on the entire loan term and the car was repossessed prior to the end of the term, some of the GAP premiums that the consumer paid and the interest charged on such premiums were not earned and are therefore eligible to be refunded by the GAP administrator. (*Id.*).

4

When USASF repossessed a car and charged off an account, its policy was to obtain a refund of any unearned GAP premiums that consumers had paid by submitting a refund request to the GAP administrator. (*Id.* ¶ 27). USASF would then apply any refund to the deficiency balance on the loan, reducing the amount that the consumer still owed on the car loan. (*Id.*). USASF failed to follow this policy for at least 2,870 consumers, resulting in over $1 million in refunds that were not obtained and applied to those consumers' deficiency balances. (*Id.* ¶ 28).

GAP coverage also becomes void and worthless when a consumer's loan is paid off before the end of the loan contract because, once the loan is paid off, there is no possibility of a deficiency for GAP to cover. (*Id.* ¶ 29). When a consumer's loan was paid off early, USASF requested a payoff amount that included GAP premiums for the full term of the loan contract. (*Id.* ¶ 30). As a result, a portion of the GAP premiums that USASF collected at early payoff was unearned because consumers paid for coverage that could never be provided. (*Id.*).

When a third party paid off a consumer's loan early, such as a lender paying off the loan because the consumer was refinancing, then USASF as a matter of course submitted a refund claim to the GAP administrator. (*Id.* ¶ 31). When doing so, USASF used the date of the loan payoff as the date the GAP was cancelled. (*Id.*).

In contrast, when a consumer paid off their loan early, USASF would not submit a refund request to the administrator unless the consumer specifically

requested a refund of unearned premiums from USASF. (*Id.* ¶ 32). USASF imposed this requirement even though the request provided USASF with no new information and was not necessary for USASF to obtain a consumer refund from the administrator. (*Id.*). And rather than use the payoff date as the date the GAP was cancelled, USASF used the date of the refund request, which resulted in lower payouts for consumers who requested refunds. (*Id.*).

USASF failed to provide refunds of unearned GAP premiums and unearned interest totaling at least $4 million for an estimated 5,600 consumers who paid off their car loans early. (*Id.* ¶ 33). Even when USASF requested consumer refunds at early payoff, it provided consumers with inaccurately small refunds because it failed to request the refund as of the payoff date and failed to refund interest charged on unearned premiums, totaling at least an additional $2 million. (*Id.*). Consumers whose loans were charged off were harmed by owing inflated deficiency balances totaling over $1 million. (*Id.* ¶ 34). Consumers whose loans were paid off early were harmed by being deprived of their refunds totaling more than $6 million. (*Id.*).

### C.    Double Billing for Collateral-Protection Insurance

Collateral-protection insurance (CPI) is physical-damage insurance that protects the lender if the consumer does not have auto insurance that covers the amount of the loan. (*Id.* ¶ 37).

U.S. Auto Finance, Inc., an affiliate of USASF, placed consumers under its CPI in two ways. (*Id.* ¶ 38). First, consumers could voluntarily agree to CPI at the point of sale for the vehicle. (*Id.*). Second, consumers could be automatically placed under U.S. Auto Finance, Inc.'s CPI if the consumer's comprehensive-and-collision insurance expired or was cancelled. (*Id.*). In either circumstance, USASF, as the loan servicer, charged the consumer for the CPI and collected payments for it. (*Id.*). The cost of CPI to consumers was around $100 per month, depending on their billing plan and area. (*Id.* ¶ 39).

From December 2015 through August 2021, USASF billed consumers at least 34,000 times in error for CPI by charging them twice, totaling an estimated $1.9 million. (*Id.* ¶ 40). USASF identified four causes of its double billing, including manual and system-processing errors by USASF. (*Id.*).

From 2015 to 2019, during the time when USASF used a servicing system called AutoStar, it often took more than 60 days for USASF to correct the double-billing error. (*Id.* ¶ 41). Later, from 2019 to 2021, after USASF switched providers to Spectrum, it took USASF even longer to correct its double billing, averaging over 120 days. (*Id.*). In over 5,800 instances, when USASF was using Spectrum, USASF failed to correct the double-billing error for more than one year. (*Id.* ¶ 42).

While USASF was double-billing consumers, it was erroneously charging them twice per billing cycle. (*Id.* ¶ 43). Further, during the time when USASF used

Spectrum, the erroneously billed CPI fee was included in the amount USASF reported to credit-reporting agencies. (*Id.* ¶ 44).

Consumers who were charged twice for CPI were deprived of the use of their funds totaling $1.9 million, and in addition some consumers became delinquent because of the billing error and as a result had their cars repossessed and were subjected to erroneous debt-collection efforts. (*Id.* ¶ 45).

### D.    Misapplied Consumer Payments

Under the contracts that USASF serviced, USASF was required to apply any payments above the regularly scheduled amount first to accrued interest. (*Id.* ¶ 48). Thousands of times, however, USASF wrongfully applied extra payments first to late fees or CPI fees instead of accrued interest. (*Id.*). USASF admitted to the Bureau that it misapplied extra payments at least 8,738 times over nearly five years, from November 1, 2016 to August 31, 2021. (*Id.* ¶ 49). Consumers whose payments were misapplied were harmed because they paid approximately $1.2 million in interest and fees that they would not have paid if USASF had correctly applied their payments. (*Id.* ¶ 50).

### E.    Wrongful Repossessions

USASF's policy is to repossess a vehicle either if a consumer misses a deferred down payment, which is an additional amount that a consumer is scheduled to pay within the first 30 days after taking possession of the vehicle and

before the first installment payment, or once a consumer is 60 days past due. (*Id.* ¶ 53).

USASF does not send a notice to the consumer informing them that it plans to repossess the vehicle unless state law requires a right-to-cure notice, which is a notice giving consumers a certain amount of time to bring their account current before their car is repossessed. (*Id.* ¶ 54).

Since July 2019, USASF has used a repossession forwarder, Primeritus, which is a company that directs local recovery agents to repossess vehicles on behalf of USASF. (*Id.* ¶ 55). From November 2016 to July 2019, USASF worked with a different repossession forwarder, Consolidated Asset Recovery System (CARS), before CARS was acquired by Primeritus. (*Id.*). USASF communicated with both repossession forwarders to connect with third-party repossession agents through a software platform called IBEAM. (*Id.*).

USASF's communication with repossession agents is limited to notices through IBEAM, including "holds" on repossession. (*Id.* ¶ 56). A hold on a repossession is a direction from USASF to not repossess a vehicle after it initially ordered a repossession. (*Id.*). Consumers qualified for holds for various reasons. (*Id.* ¶ 57). Under USASF policy, a hold should have been triggered when a consumer made a payment or a promise to pay, or when a consumer entered bankruptcy. (*Id.*). Consumer accounts could also qualify for a repossession hold if

USASF agreed to defer a payment, which could be on account of a natural disaster or the loss of employment, among other reasons. (*Id.* ¶ 58).

In addition, the Servicemembers Civil Relief Act (SCRA) prohibits repossession of vehicles of active-duty servicemembers without a court order. (*Id.* ¶ 59). USASF (or its agent) performed so-called "SCRA scrubs" to check whether a consumer was on active military duty. (*Id.*). If so, that should also have triggered a hold on repossession. (*Id.*).

Prior to December 2020, USASF did not have a formal process to flag activities on an account that would trigger a repossession hold. (*Id.* ¶ 60). As a result, servicing supervisors were not notified when, for example, a consumer made a payment or a promise to pay, or when USASF received notice that the consumer was in bankruptcy. (*Id.*). Consequently, prior to December 2020, there was no servicing supervisor oversight as to whether a repossession hold should be in place on an account that had been sent to a forwarder. (*Id.*).

Prior to December 2021, USASF did not have a process to automatically send a repossession-hold request to its repossession forwarder when a consumer made a payment or a promise to pay, or when USASF received notice that the consumer was in bankruptcy. (*Id.* ¶ 61). USASF's failure to implement these processes caused dozens of erroneous repossessions of consumers' vehicles. (*Id.* ¶ 62).

At least 47 consumers made a payment that should have stopped the repossession, but because USASF failed to close the repossession assignment, consumers' vehicles were nonetheless repossessed. (*Id.* ¶ 63). Even when a USASF employee correctly closed the repossession assignment, USASF failed to effectively manage its recovery agents and failed to implement sufficient controls to ensure that repossession assignments were properly closed, resulting in wrongful repossessions for at least seven additional consumers. (*Id.* ¶ 64).

Several more consumers made a promise to pay, and a USASF employee either failed to close the repossession assignment or failed to enter the promise to pay into USASF's system, causing consumers to lose their cars. (*Id.* ¶ 65). USASF agreed to a deferred payment with at least two consumers, which, when not processed by USASF employees, resulted in repossession. (*Id.* ¶ 66). In at least one instance, USASF repossessed a vehicle before the state required "right to cure" letter had expired. (*Id.* ¶ 67). At least five consumers did not qualify for repossession in the first instance, yet USASF assigned their accounts for repossession in error. (*Id.* ¶ 68). At least another five consumers informed USASF of their bankruptcy filing, but USASF's failure to close the repossession assignment caused consumers to nonetheless have their vehicles repossessed, in violation of consumer bankruptcy protections. (*Id.* ¶ 69).

In total, USASF admitted to the Bureau that it wrongfully repossessed vehicles 78 times. (*Id.* ¶ 70). In addition to those 78 repossessions that USASF admitted were wrongful, it wrongfully repossessed at least four vehicles where the consumer was active-duty military. (*Id.* ¶ 71). Some consumers' vehicles were sold by USASF. (*Id.* ¶ 72). When USASF returned the wrongfully repossessed vehicles to consumers, as opposed to selling them, consumers were harmed by not being able to use their vehicles for up to 17 days. (*Id.*).

## II.    USASF's Bankruptcy

On August 25, 2023, USASF commenced a case under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, by filing a Voluntary Petition with the U.S Bankruptcy Court for the District of Delaware, Case No. 23-11256-TMH. (*See* Doc. 5). USASF's bankruptcy case was, on September 25, 2023, ordered procedurally consolidated and jointly administered with 5 other affiliated debtors under lead case *In re U.S. Auto Sales, Inc.*, Case No. 23-11251-TMH. (Doc. 8 ¶ 1). Don A. Beskrone was appointed Chapter 7 Trustee of the consolidated cases. (*Id.*). The consolidated cases remain pending.

## Discussion

## I.    Motion to Seal

As an initial matter, the Court first considers the Bureau's Motion to Seal certain exhibits to its Motion.

**A.      Legal Standard for Motion to Seal**

"[T]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (quoting *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). But this right "may be overcome by a showing of good cause, which requires 'balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential.'" *Id.* at 1246. "[W]hether good cause exists . . . is . . . decided by the nature and character of the information in question." *Id.*

> In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents. *See In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987); *Shingara v. Skiles*, 420 F.3d 301, 305–06 (3d Cir. 2005); *Amodeo*, 71 F.3d at 1050–51. A party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978); Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L. Rev. 427, 464–74 (1991).

*Id.*

### B.      Application to the Bureau's Motion

The Bureau seeks to seal Attachments S-1 through S-3 to its Motion. The Bureau's justification for sealing is that it "has an interest in protecting its law enforcement techniques and methods so it may effectively enforce consumer protection laws. (Doc. 14 at 2–3).[2] It contends that "[t]he public release of these Attachments 'would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.'" (citing *Frank LLP v. Consumer Fin. Prot. Bureau*, 480 F.Supp. 3d 87, 103 (D.D.C. 2020); *Frank LLP v. Consumer Fin. Prot. Bureau*, 327 F. Supp. 3d 179, 185 (D.D.C. 2018)). To support this argument, the Bureau relies on cases interpreting the Freedom of Information Act (FOIA). But just as the "nature of . . . rule[s] in civil discovery . . . is irrelevant in the FOIA context," so too are FOIA exemptions in the Rule 26 analysis. *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 27 (1983).

Moreover, courts have held that "[p]ublicly available information cannot be sealed," and examples of Bureau Civil Investigative Demands and responses are readily available on the internet, including on the Bureau's own website. *See In re*

---

[2] The Bureau also originally conceded that USASF should have the opportunity to argue that S-2 was protected trade secret information, but the Chapter 7 Trustee for USASF's bankruptcy estate waived trade secret protection. (Doc. 15).

*Nat'l Credit Sys., Inc's Petition to Set Aside Civ. Investigative Demand*, No. 2022-MISC-National Credit Systems, Inc.-000 (*Consumer Fin. Prot. Bureau* Oct. 18, 2022), https://files.consumerfinance.gov/f/documents/cfpb_national-credit-systems-inc_petition_2023-1.pdf. Several examples were even filed publicly in a case before another judge of this district. *See* Exhibits A–D of Respondent's Motion to Stay, Docs. 3-1 to 3-4, *Consumer Fin. Prot. Bureau v. Cmty. Loans of Am., Inc.* No. 1:23-mi-00100-SEG (N.D. Ga. Nov. 16, 2023).

Accordingly, the Court finds that the Bureau has not met its burden for sealing the exhibits. However, the Court will not "unseal" the exhibits. Under Local Rule Appendix H(II)(J)(2)(h), "[d]ocument(s) from a provisionally sealed filing that the Court did not approve for sealing will be treated as withdrawn and will not be considered by the Court." Consideration of these exhibits is unnecessary because the Bureau's damages witness, Nicole Kelly, is qualified as an expert by knowledge, skill, experience, training, or education, and therefore the bases of her opinion need not be admitted for her opinions to be admitted. (Doc. 12-3 ¶ 2) ("Since 2021, I have been a Senior Data Scientist. My current duties include conducting financial and data analysis for the Bureau. I have a bachelor's degree in Applied Economics and Management from Cornell University."). However, as the Court is directing the Bureau to supplement the Kelly

Declaration, the Bureau may renew their motion or file the exhibits publicly at their option.

## II.  Motion for Default Judgment

The Court next turns to the Motion for Default Judgment. The Court first considers the Bureau's arguments that this civil action is not stayed by USASF's bankruptcy filing. Next, it considers liability, and finally remedies.

### A.  Legal Standard for Motion for Default Judgment

If a defendant fails to plead or otherwise defend a lawsuit within the time required by Federal Rule of Civil Procedure 12(a)(1)(A), upon motion, the clerk must enter default against the defendant pursuant to Federal Rule of Civil Procedure 55(a). A default constitutes admission of all well-pleaded factual allegations contained in the complaint but is not considered an admission of facts that are not well-pleaded or conclusions of law. *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005). "Before a default can be entered, the court must have subject-matter jurisdiction and jurisdiction over the party against whom the judgment is sought, which also means that the party must have been effectively served with process." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2682 (4th ed. 2008) (citations omitted).

Once a default has been entered, the Court has the "discretion in determining whether the judgment should be entered." *Patray v. Nw. Publ'g, Inc.*,

931 F. Supp 865, 868 (S.D. Ga. 1996) (internal footnote and citation omitted); Fed. R. Civ. P. 55(b); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1576 (11th Cir. 1985) ("The entry of a default judgment is committed to the discretion of the district court.").

The Eleventh Circuit has made clear that entry of judgment by default is not granted as a matter of right and is judicially disfavored because there is a "strong policy of determining cases on their merits." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244–45 (11th Cir. 2015) (citation omitted); *see also Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1316–17 (11th Cir. 2002) ("Entry of judgment by default is a drastic remedy which should be used only in extreme situations, . . . we must respect the usual preference that cases be heard on the merits rather than resorting to sanctions that deprive a litigant of his day in court.").

Entry of default judgment is only warranted when there is "a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F. 2d 1200, 1206 (5th Cir. 1975). Although *Nishimatsu* did not elaborate as to what constitutes "a sufficient basis" for the judgment, courts have subsequently interpreted the standard as being akin to that necessary to survive a motion to dismiss for failure to state a claim. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997) ("[A] default judgment cannot stand on a

complaint that fails to state a claim."). Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim. *See Wooten v. McDonald Transit Assocs., Inc.*, 775 F.3d 689, 695 (5th Cir. 2015) (stating in the context of a motion for default judgment, "whether a factual allegation is well-pleaded arguably follows the familiar analysis used to evaluate motions to dismiss under Rule 12(b)(6)").

When evaluating a motion to dismiss, a court looks to see whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556); *Surtain*, 789 F.3d at 1245 (footnote omitted). "The court must therefore examine the sufficiency of plaintiff's allegations to determine whether plaintiff is entitled to an entry of judgment by default." *Fidelity & Deposit Co. of Md. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988). The Supreme Court has explained that the pleading standard of Rule 8 of the Federal Rules of Civil Procedure "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation

18

of the elements of a cause of action will not do. Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S.at

678 (citations and quotations omitted).

"This analysis is equally applicable to a motion for default judgment."

*Edenfield v. Crib 4 Life, Inc.*, No. 6:13-CV-319-Orl-36KRS, 2014 WL 1345389, at *2

(M.D. Fla. Apr. 4, 2014) (adopting Report and Recommendation) (citing *De Lotta v.*

*Dezenzo's Italian Rest., Inc.*, No. 6:08-CV-2033-Orl-22KRS, 2009 WL 4349806, at *5

(M.D. Fla. Nov. 24, 2009)).

Further, the Court may only enter a judgment by default without a hearing

where the amount of damages is a liquidated sum or one capable of mathematical

calculation. Fed. R. Civ. P. 55(b): *Jenkins v. Clerk of Court*, 150 F. App'x 988, 989 (11th

Cir. 2005). Whether to hold a hearing is committed to the Court's discretion.

*DIRECTV, Inc. v. Huynh*, 318 F. Supp, 2d 1122, 1129 (M.D. Ala. 2004) (citing Fed.

R. Civ. P. 55(b)(2)).

A plaintiff requesting a default judgment award under Rule 55(b)(1) must

provide an affidavit and evidence supporting that it is entitled to a specific, certain

sum of money. *Lubin, Sarl, a French Co. v. Lubin N. Am., Inc.*, No. 1:13-CV-2696-AT,

2014 WL 11955396, at *2 (N.D. Ga. Apr. 10, 2014). "A claim is not a sum certain

unless there is no doubt as to the amount to which a plaintiff is entitled as a result

of the defendant's default. Examples of actions seeking a sum certain include

actions on money judgments and negotiable instruments." *Id.* (citations and internal punctuation omitted).

### B.    Automatic Stay and Bankruptcy Consequences

Before the Court can reach the merits of the Bureau's Motion, the Court must consider the consequences of USASF's bankruptcy filing. The filing of USASF's Voluntary Petition operated as an automatic stay of, among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case" under the Bankruptcy Code. 11 U.S.C. § 362(a)(1). However, the filing did not operate as a stay "of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment . . . ." 11 U.S.C. § 362(b)(4). This exception to the operation of the automatic stay is often referred to as the "police power" exception. *See In re Harris*, 592 B.R. 750, 755 (Bankr. N.D. Ga. 2018).

This Court has concurrent jurisdiction with the bankruptcy court to determine whether the "police power" exception applies to the continuation of this case, which was commenced prepetition. *See In re Cole*, 552 B.R. 903, 908 (Bankr. N.D. Ga. 2016). "An analysis under § 362(b)(4) 'requires a court to

determine whether the action in question is undertaken by a governmental unit and whether it is an action enforcing that unit's police or regulatory powers.'" *Harris*, 592 B.R. at 754 (quoting *In re Chintella*, No. 13-73481, 2014 WL 3672882, at *4 (Bankr. N.D. Ga. June 20, 2014)). "While the Eleventh Circuit has not adopted any test, courts have generally used two tests to assess whether an action should be exempt from the automatic stay under § 362(b)(4): the pecuniary purpose test and the public purpose test." *Id.* (collecting cases). "Under the pecuniary purpose test, if the action taken by the governmental unit relates primarily to the protection of a pecuniary interest in the debtor's property, the automatic stay applies." *Id.* at 754–55 (citing *In re Chintella*, 2014 WL 3672882, at *5). "If the action is more closely related to matters concerning public welfare, it may be excepted from the stay. Similarly, the public purpose test looks to whether a proceeding is designed to 'effectuate public policy' or 'adjudicate private rights.'" *Id.* at 755 (citing *In re Chintella*, 2014 WL 3672882, at *5–6). "[W]hen the action incidentally serves public interests but more substantially adjudicates private rights, courts should regard the suit as outside the police power exception, particularly when a successful suit would result in a pecuniary advantage to certain private parties vis-a-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities." *Id.* (quoting *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 390 (6th Cir. 2001)). Regardless of which test is applied, "[t]he exceptions to the automatic stay in § 362(b) are to be

read narrowly." *Id.* at 757 (citing *Hillis Motors, Inc. v. Haw. Auto Dealers' Ass'n*, 997 F.2d 581 (9th Cir. 1993)).

The Bureau contends that it satisfies the pecuniary purpose test because it "seeks an injunction prohibiting future violations of the Consumer Financial Protection Act (CFPA), redress for consumers, a penalty against Defendant, and costs," contending that "[s]uch a consumer-protection action effectuates public policy and is not solely in the Bureau's pecuniary interest, and therefore is the government's enforcement of its police and regulatory power." (Doc. 6 at 2). Other judges in this district have held that a suit by a government agency seeking redress for harms done to private persons satisfies the pecuniary purpose test. *Equal Emp. Opportunity Comm'n v. Krystal Co.*, 615 B.R. 332, 335 (N.D. Ga. 2020).

Moreover, the Court agrees that the public purposes served by the Bureau's enforcement action here is not merely incidental, but rooted in the concern for the financial wellbeing of the public by seeking an injunction against unfair and deceptive acts and practices. (*See generally* Doc. 1). Accordingly, the Court finds that the police power exception applies.

However, this does not end the Court's inquiry. Trustee Beskrone filed a response requesting a stay of the case, explaining that "[w]hile I appreciate and acknowledge the arguments put forth by the CFPB regarding the 'police and regulatory power' exception to the automatic stay[,] I respectfully submit that the

case should not move forward nor should default be entered" because "I believe the entry of a default may have unintended prejudicial effects on the Debtors' estates and their assets." (Doc. 8 ¶¶ 4 n.1, 6).

First, Beskrone contends that there is no longer urgency to resolve this civil action because the commencement of a chapter 7 case precludes operation of USASF's continued operations without authorization from the bankruptcy court, authorization he represents he does not intend to seek. (*Id.* ¶ 5, 7) (citing 11 U.S.C. § 721). Nonetheless, Beskrone does not oppose the injunctive relief sought here. (*Id.*).

Second, Beskrone argues that the Bureau's damages claims should be addressed in the claims allowance process to ensure fair and equal treatment among all creditors. (*Id.* ¶ 8). In the claims allowance process, a party in interest, including another creditor, may object to the allowance of a claim. 11 U.S.C. § 502(a); *see also In re C.P. Hall Co.*, 513 B.R. 540 (Bankr. N.D. Ill. 2014) ("The right to object to claims that section 502(a) grants creditors . . . is unqualified."). *But see Trauner v. Huffman (In re Trusted Net Media Holdings, LLC)*, 334 B.R. 470, 476 (Bankr. N.D. Ga. 2005) ("[S]everal courts have held that where a trustee is appointed to administer an estate, a creditor can object to the claim of another creditor only if, upon demand, the trustee refuses to do so and the court grants the creditor the right to act on behalf of the trustee"). In such a case, the bankruptcy court must

23

"determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition" in a summary proceeding known as a contested matter, where certain of the Federal Rules of Civil Procedure apply. Fed. R. Bankr. P. 3007(b), 9014; *see also* 4 Collier on Bankruptcy ¶ 502.02[3][b] (16th 2024). To the extent a claim is allowed and otherwise unsecured by collateral, it is paid pro rata with other allowed, unsecured claims. 11 U.S.C. § 726(b). Resolving the claim here arguably short-circuits this process.[3] That said, Congress seemed comfortable with that result by enacting Section 362(b)(4). By only precluding *enforcement* of money judgments in police power actions, Congress inherently permitted the *entry* of money judgments. *Cf. Krystal*, 615 B.R. at 336 ("The Court declines to impose this more generally applicable discretionary stay, however, where there is a more specific staying mechanism provided for by a statute, 11 U.S.C. § 362(a), that expressly does not apply."). Moreover, it seems the Trustee's concerns are largely hypothetical here. The Bureau filed Proof of Claim No. 322 on February 20, 2024 in the unsecured amount of $42,627,689.00. *U.S. Auto Sales*, No. 23-11251-TMH. It does not appear that any other creditor or party in interest objected to the claim since then.

---

[3] The preclusive effect of a judgment of this court exercising federal question jurisdiction in the claims allowance process is of course a question of federal law to be determined by the bankruptcy court in the first instance.

Lastly, any civil penalties sought by the Bureau will likely be subordinated to general unsecured creditors, ameliorating some concerns about dilution of other claims. 11 U.S.C. § 726(a)(4) (providing fourth priority for allowed claims arising from "any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim."). Accordingly, the Court will not issue a discretionary stay of this matter pending claims allowance.

### C.    Liability

The CFPA "makes it unlawful for any 'covered person'—defined as anyone who 'engages in offering or providing a consumer financial product or service'— or any service provider 'to engage in any unfair, deceptive, or abusive act or practice.'" *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 35 F.4th 734, 740 (9th Cir. 2022) (citing 12 U.S.C. §§ 5481(6)(A), 5536(a)(1)(B)). "The statute does not define 'unfair,' 'deceptive,' or 'abusive,' *id.*, but another part of the CFPA providing the Bureau with rulemaking authority to declare acts and practices "to be unlawful on the grounds that such act or practice is unfair," requires a showing that

> (A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

> (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

12 U.S.C. § 5531(c).

Assuming this standard applies, USASF has conceded upon default that the challenged practices caused substantial injury to consumers (Doc. 1 ¶¶ 18, 34, 45, 50, 72) which was not reasonably avoidable by consumers. (*id.* ¶¶ 20, 35, 46, 51, 73, 78). The Bureau has adequately alleged, as discussed in the Background section above, the many ways that USASF has caused harm to consumers. Moreover, the Court agrees that consumers would have no reason to expect that USASF would wrongfully disable or repossess vehicles or charge fees without a legal basis. *Fed. Trade Comm'n v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1325 (N.D. Ga. 2022) ("Where 'anticipatory avoidance' and 'subsequent mitigation' are not reasonably possible, the injury is not reasonably avoidable.") (citing *Orkin Exterminating Co.*, 849 F.2d at 1365–66 (11th Cir. 1988)). Lastly, assuming that the Bureau, and not USASF, would have the burden of showing an absence of countervailing benefits at trial, the Court finds that the Bureau has met its burden. Any minute benefit to consumers or competition from challenged practices in the form of lower financing costs would be drastically outweighed by the instability that would come with unpredictable and unlawful fees and collection activity. The Court thus turns next to remedies.

### D.    Injunctive Relief

Injunctive relief under the CFPA is available. 12 U.S.C. § 5565(a)(1) (providing the Court with jurisdiction "to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law"), (2) ("Relief under this section may include . . . limits on the activities or functions of the person."). USASF's Chapter 7 Trustee Beskrone does not oppose entry of the requested injunctive relief. (Doc. 8 ¶ 7). Accordingly, the Court will enter the proposed injunctive relief at the time of final judgment.

### E.    Damages

The Bureau seeks restitution for unearned GAP premiums, compensatory damages for wrongful activation of SIDs and repossessions, and a civil monetary penalty.

To calculate restitution and compensatory damages, the Bureau relies on the Declaration of Senior Data Scientist Nicole Kelly. (Doc. 12-3). However, the Kelly Declaration's compensatory damages estimate is flawed because it relies on estimates provided by litigation counsel. (Doc. 12-3 ¶ 12 ("At the request of Bureau counsel, I used $500 as the amount of harm to each consumer for an erroneous SID disable."), ¶ 20 ("At the request of Bureau counsel, I used $100 as the amount of harm to a consumer for each day an erroneous warning tone occurred."), ¶ 29 ("At

the request of Bureau counsel, I used a flat amount of $5,000 of harm for each wrongful repossession.").

The Bureau derived these flat amounts based on declarations submitted by consumers harmed by USASF and citations to damages awards in similar cases. The Bureau contends that the Court may use these amounts to reasonably estimate damages. But "[w]here the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Instead, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Id.*

The Court is not comfortable extrapolating from the anecdotal evidence provided by the Bureau without further evidence that the estimates are based on sufficient facts or data and drawn from the data based on reliable methods. The Bureau must supplement the Kelly Declaration with more expert evidence to support the veracity of these flat amounts. The Court will not direct the evidence to take any particular form, but at a minimum it must provide some basis within a reasonable degree of confidence that these flat amounts are representative of the classes of injuries consumers generally faced in this case.

## Conclusion

For the above reasons, it is

28

**ORDERED** that Plaintiff's Motion for Default Judgment (Doc. 12) is **GRANTED IN PART** as to liability and injunctive relief. It is

**FURTHER ORDERED** that Plaintiff is **DIRECTED** to supplement the Kelly Declaration as set forth in this Order within 35 days of the date of entry of this Order.

**SO ORDERED** this 28th day of August, 2024.

Victoria Marie Calvert
United States District Judge